**KABATECK BROWN KELLNER LLP**
Brian S. Kabateck (SBN 152054)
bsk@kbklawyers.com
Richard L. Kellner - (SBN 171416)
rlk@kbklawyers.com
Engine Company No. 28 Building
644 South Figueroa Street
Los Angeles, CA 90017
Phone: (213) 217-5000
Fax: (213) 217-5010

**SMOGER & ASSOCIATES**
Steven M. Bronson (SBN 246751)
steven.bronson@gmail.com
3175 Monterey Blvd
Oakland, CA, 94602-3560
Phone: (510) 531-4529
Fax:   (510) 531-4377

**WILLIAMS CUKER & BEREZOFSKY**
Mark R. Cuker (*Pro Hac Vice* App. Pending)
mcuker@wcblegal.com
Michael J. Quirk (*Pro Hac Vice* App. Pending)
Mquirk@wcblegal.com
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA 19103-1819
Phone: (215) 557-0099
Fax:   (215) 557-0673

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax:   (818) 654-5988

[*Additional counsel listed on signature page*]
Attorneys for Plaintiffs and others Similarly Situated.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**CV09-05438 AHM (RCx)**

| | |
|---|---|
| JOSEPH A. MONACO, ANITA M. MONACO, and JAMES BRANDT, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE BEAR STEARNS COMPANIES, INC; BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION; BEAR STEARNS & CO.; EMC MORTGAGE CORPORATION, JPMORGAN CHASE & CO. and DOES 1 through 10 inclusive, <br><br> Defendants. | CASE NO. _____ <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **(1)  Violations of the Truth in Lending Act, 15 U.S.C. §1601, *et seq*;** <br><br> **(2)  Fraudulent Omissions;** <br><br> **(3)  Violation of Bus. & Prof. Code §17200, *et seq*. – "Unlawful," "Unfair" and "Fraudulent" Business Practices;** <br><br> **(4)  Breach of Contract; and** <br><br> **(5)  Tortious Breach of the Covenant of Good Faith and Fair Dealing.** <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

1    Plaintiffs, JOSEPH A. MONACO, ANITA M. MONACO, and JAMES BRANDT

2  ("Plaintiffs"), individually and on behalf of all others similarly situated allege as follows:

3                                        **I.**

4                            **<u>INTRODUCTION</u>**

5         1.    This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C.

6  §§1601, *et seq.,* California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code

7  §§ 17200, *et seq.,* and other statutory and common law.  Plaintiffs, individually, and on

8  behalf of all others similarly situated ("Class Members") bring this action against THE

9  BEAR STEARNS COMPANIES, INC., BEAR STEARNS RESIDENTIAL

10  MORTGAGE CORPORATION; BEAR STEARNS & CO.; EMC MORTGAGE

11  CORPORATION; JPMORGAN CHASE & CO., and DOES 1· ¯*10* (collectively,

12  "Defendants"), based upon Defendants' failure to clearly, unambiguously and

13  conspicuously disclose to Plaintiffs and the Class Members, in Defendants' Option

14  Adjustable Rate Mortgage ("Option ARM") loan documents, and in the accompanying

15  required disclosure statements:  (i) the actual interest rate on the Notes (12 C.F.R. §

16  226.17);  (ii) that the initial interest rate disclosed in the Notes would last only one

17  month, was discounted, and was substantially lower than the actual interest that Plaintiffs

18  and Class Members would be actually charged on the Notes; (iii) that the amount of

19  monthly payments provided for in the Notes and for the first 3-5 years in the Truth in

20  Lending Disclosure Statement ("TILDS") was based  entirely on the "teaser" rate; and

21  (iv) the amount of the monthly payments after one month would not be sufficient to even

22  pay the interest being charged, let alone amortize the loan, so that each month the

23  principal balance would increase even if the payments were made as scheduled (12

24  C.F.R. § 226.19).  (Hereinafter, (i) through (iv) shall be referred to as "The Material

25  Omissions").

26         2.    On August 28, 2007, Plaintiffs filed their original complaint, *Monaco, et al.*

27  *v. Bear Stearns, et al.,* No 2:07-cv-05607-SJO-CT (C.D. Cal.).  Pursuant to a stipulation

28  and tolling agreement, on February 5, 2009, the Honorable James S. Otero granted the

Case 2:09-cv-05438-SJO-JC   Document 1   Filed 07/24/09   Page 3 of 75   Page ID #:3

1  dismissal, without prejudice, which tolled, for purposes of the statute of limitations, any

2  claims asserted by Plaintiffs, or that could have been asserted by Plaintiffs, from August

3  28, 2007 through July 29, 2009. See Document 70.

## II.

## THE PARTIES

6  3.     Plaintiffs JOSEPH A. MONACO and ANITA M. MONACO are, and at all

7  times relevant to this Complaint were, individuals residing in Palmdale, California. On

8  or about April 10, 2006, Mr. and Mrs. Monaco refinanced their existing home loan and

9  entered into an Option ARM loan agreement with Defendants. The Option ARM loan

10  was secured by Mr. and Mrs. Monaco' residence. Attached hereto as Exhibit 1 are true

11  and correct copies of the Note, Truth and Lending Disclosure Statement ("TILDS"), and

12  Program Disclosure (collectively the "Loan Documents"), pertinent to this action.

13  4.     Plaintiff JAMES BRANDT is, and at all times relevant to this Complaint

14  was, an individual residing in Santa Clarita, California. On or about April 24, 2007, Mr.

15  Brandt refinanced his existing home loan and entered into an Option ARM loan

16  agreement with Defendants. The Option ARM loan was secured by Mr. Brandt's

17  primary residence. Attached hereto as Exhibit 2 are true and correct copies of the Loan

18  Documents pertinent to this action.

19  5.     Defendant THE BEAR STEARNS COMPANIES, INC. ("TBSC" or "Bear

20  Stearns") was the parent corporation and holding company of all Bear Stearns entities

21  and is presently a wholly owned subsidiary of JP MORGAN CHASE, a publicly traded

22  company.

23  6.     Defendant  BEAR STEARNS RESIDENTIAL MORTGAGE

24  CORPORATION ("BSRMC") is, and at all relevant times was, qualified to do business

25  in California, and doing business in this judicial district. BSRMC is a subsidiary of

26  EMC Mortgage Corporation, which is a subsidiary of TBSC. Defendant BSRMC is a

27  California corporation licensed to do business and doing business in California. At all

28  relevant times hereto BSRMC was and is engaged in the business of originating,

CLASS ACTION COMPLAINT

1  distributing and selling the Option ARM loans that are the subject of this Complaint.

2  BSRMC transacts business in Los Angeles County, California and at all relevant times

3  originated, distributed, and sold Option ARM loans throughout the United States,

4  including Los Angeles County, California.  BSRMC has significant contacts with Los

5  Angeles County, California, and the activities complained of herein occurred, in whole

6  or in part, in this District.

7       7.     Defendant BEAR STEARNS & CO. (" BS&C") is a wholly owned

8  subsidiary of TBSC and is, and at all material times relevant to this Complaint was,

9  qualified to do business in California and doing business in this judicial district.

10  Plaintiffs are informed, believe, and thereon allege that Defendant BEAR STEARNS &

11  CO. purchased, securitized, bonded and/or acted as an underwriter in the securitization

12  of some or all of the Option ARM loans that are the subject of this Complaint.

13       8.     Defendant, EMC MORTGAGE CORPORATION ("EMC MORTGAGE"),

14  is a Delaware Corporation, headquartered at 2780 Lake Vista Drive, Lewisville, TX,

15  75067-3884, and is a wholly owned subsidiary of TBSC.  Plaintiffs are informed,

16  believe, and thereon allege that EMC MORTGAGE purchased, securitized, bonded or

17  otherwise is and was an assignee of some or all of the Option ARM loans that are the

18  subject of this Complaint.

19       9.     At all times relevant, EMC,  BSRMC and TBSC and BS&C, in concert with

20  the other Defendants, created, approved, sold, controlled and/or dictated the terms of the

21  Option ARM loans that are the subject of this complaint.

22       10.    EMC MORTGAGE was organized for the purpose of providing mortgage

23  lending institutions with greater financing and lending flexibility by purchasing

24  mortgage loans from such institutions and working with other Bear Stearns entities,

25  including BS&C to issue mortgage-backed securities.

26       11.    On April 10, 2006, BSRMC sold and/or assigned Plaintiffs Mr. and Mrs.

27  Monaco's Option ARM loan that is the subject of this action, together with all rights and

28  liabilities associated therewith, to Defendant EMC MORTGAGE.  On April 24, 2007,

1  BSRMC sold and/or assigned Plaintiffs Mr. Brandt's Option ARM loan that is the

2  subject of this action, together with all rights and liabilities associated therewith, to

3  Defendant EMC MORTGAGE.  Plaintiffs are informed and believe and thereon allege

4  that certain DOE defendants were sold and/or assigned Option ARM loans that are at

5  issue in this action, together with all rights and liabilities associated therewith.

6      12.    Plaintiffs are informed, believe, and thereon allege that Defendants EMC

7  MORTGAGE and DOES 1-200 were and are engaged in the business of purchasing,

8  packaging, designing, and securitizing some of the Option ARM loans that are the

9  subject of this Complaint, including Plaintiffs' Option ARM loans.  Plaintiffs are further

10  informed, believe, and thereon allege that:

11      (a)    EMC MORTGAGE is, and/or was, in the business of, among other

12          things, securitizing home mortgage loans by packaging those loans

13          into trusts or other vehicles so that it could sell bonds to investors

14          based on the income to be derived from those loans.  EMC

15          MORTGAGE is a critical and necessary participant in that

16          securitization process.

17      (b)    EMC MORTGAGE agreed to purchase and did purchase numerous

18          Option ARM mortgages originated by BSRMC and others.  Through

19          that arrangement, EMC MORTGAGE and others collected fees from

20          the homeowners who had Option ARM loans and also collected

21          revenues through the securitization process.

22      (c)    EMC MORTGAGE's agreement to purchase the Option ARM loans

23          originated by BSRMC  and others was critical to the ability of

24          BSRMC and other originators  to market and sell those loans to

25          Plaintiffs and other homeowners, since BSRMC and most originators

26          Does 1-200 lacked the financial resources to continue to issue the

27          Option ARM loans here at issue unless it was able to sell them to

28          packagers such as EMC MORTGAGE.

CLASS ACTION COMPLAINT

13.     While providing that stream of financing to BSRMC and other originators, Defendants EMC MORTGAGE, and DOES 1-200 were aware of The Material Omissions.

14.     Defendant JPMORGAN CHASE & CO. ("JPMORGAN CHASE") is, and at all relevant times was qualified to do business in California, doing business in this judicial district.  On or about May 30, 2008, JPMORGAN CHASE acquired BEAR STEARNS and its subsidiaries in a merger for approximately $1.5 billion in stock and is the successor in interest to the Bear Stearns entities, including BSRMC, BS&C and TBSC.  In addition, Plaintiff is informed and believes that, through the purchase of BEAR STEARNS, JPMORGAN CHASE purchased or otherwise is and was an assignee of or investor in some or all of the Option ARM loans that are the subject of this Complaint. JPMORGAN CHASE is therefore liable for the acts and omissions alleged herein.  JPMORGAN CHASE transacts and has transacted significant business in California and in Los Angeles County, California by purchasing, designing, distributing, selling and/or servicing Option ARM loans to Plaintiff and Class Members.

15.     Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds, mortgage brokers or other entities that acted as loan originators, additional lenders and/or securitizers , and/or are assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

16.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10 inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and belief, that each DOE defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of Court to amend this Complaint when the names of said DOE defendants have been ascertained.

CLASS ACTION COMPLAINT

# THE BEAR STEARNS SECURITIZATION MACHINE

17.     At all times mentioned herein, Defendants were engaged in the business of originating, selling, securitizing, servicing, and/or owning, and/or are or were the assignees of, the Option ARM loans that are the subject of this Complaint, throughout the United States, including in Los Angeles County, California.

18.     At the time the Transactions at issue in this litigation were consummated, BEAR STEARNS had long been a leader in all facets of mortgage-loan securitization, at or near the top of the charts for issuance and underwriting of mortgage-backed securities for 17 years running.[1]  Through its network of affiliates, BEAR STEARNS controlled every step in the mortgage-loan-securitization chain: from the origination and servicing of loans that provided the cash flow for the mortgage-backed securities; to the "warehouse" or temporary financing of large pools of "whole loans" pending their pooling and securitization into mortgage backed securities; to the underwriting and distribution of the mortgage-backed securities that provided permanent financing to EMC with respect to the mortgage loans; to the management of hedge funds that it caused to buy the mortgage-backed securities.

19.     EMC played a crucial role within the BEAR STEARNS securitization machine.  According to SEC filings, BEAR STEARNS established EMC in 1990 as its mortgage-backing arm to facilitate the purchasing and servicing of mortgage loans as a complement to BEAR STEARNS' own loan originations.  Since its inception, EMC has contributed greatly to Bear Stearns' rise to the very top of the mortgage-finance industry by purchasing over $200 billion in residential whole loans and servicing rights.  BEAR STEARNS, through EMC and other subsidiaries, thus acted both as "originator" and an

---

[1] *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006, *available at:* http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market")

CLASS ACTION COMPLAINT

1  "aggregator" of an enormous volume of residential mortgage loans, with the ultimate

2  strategy of securitizing them into an array of Bear Stearns'[s] securitizations.  EMC

3  repeatedly executed on that strategy, in many cases retaining the rights to act as servicer

4  of the mortgage loans that it securitized.  In its role as aggregator, EMC prescribed loan

5  origination standards and approved the underwriting guidelines of its vast network of

6  loan originators, and whose loan origination activities it thus helped finance.

7      20.    BEAR STEARNS reported in 2006 that "Our vertically integrated franchise

8  allows us to access every step of the mortgage process, including originating,

9  securitization, distribution and servicing", and that it was first in the U.S. mortgage-

10 backed security underwriting and securitization of adjustable rate mortgages.

11     21.    The product of this machine was a successful and extraordinarily profitable

12 enterprise. Bear Stearns recorded gains and earned fees at every step in this chain: (i)

13 loan-origination fees, (ii) servicing fees, (iii) gains on sale of the mortgages to the

14 securitization trusts, (iv) fees from underwriting mortgage-backed securities, (v) gains

15 and fees from CDOs into which these securities were repackaged, (vi) gains and fees

16 from trading in these securities and interests in the CDOs into which they were placed,

17 and (vii) management fees and carried interests from hedge funds and other investment

18 vehicles that invested in the vast array of securities and financial products structured by

19 Bear Stearns that ultimately were backed by residential mortgage loans.

20     22.    From 2003 to 2006, Bear Stearns' revenue and profit increased by 123.8%

21 and 77.6%, respectively, driven in large part by mortgage finance and its securitization

22 machine.[2]  Consistently, the volume of EMC's securitizations grew markedly over the

23 same period.  According to SEC filings, in 2003, EMC securitized 86,000 loans valued at

24 approximately $20 billion.  That number tripled in 2004 to 230,000 loans, valued at $48

25 billion.  In 2005, the number jumped to 389,000 loans, valued at nearly $75 billion.  And

26 in 2006, EMC securitized over 345,000 loans valued at $69 billion.  All told, from 2003

27 

28 [2]  Bear Stearns Companies Inc., Annual Report (Form 10-K), at 70 (Nov. 30, 2006); Bear Stearns
   Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

CLASS ACTION COMPLAINT

to 2007, EMC purchased and securitized more than one-million mortgage loans originally valued in excess of $212 billion.  For 2006, Bear Stearns' overall securitization volume rose to $113 billion from $95 billion in fiscal 2005, amounting to 11% of the overall U.S. mortgage-backed securities market.[3]

23.    The securitization process begins with Bear Stearns directing EMC to acquire certain mortgages, which a Bear Stearns entity then purchases from EMC.  In the next step, a Bear Stearns entity, in its role as Depositor, transfers the ownership of the bundle of mortgages to a Trust.  This initial conveyance of the legal ownership of the subject mortgages also includes the Notes underlying the mortgages, since it is the Note that obligates the borrower to make payments, and also any Real Estate Owned ("REO") properties, which are residential properties that have come to be owned by the mortgage holder, usually through foreclosure.  The trustee of the Trust is typically a third party financial institution such as Wells Fargo or J.P. Morgan.  In return, BEAR STEARNS receives Certificates back from the Trustee, which BEAR STEARNS in turn sells to investors, holds for its own benefit or passes back to EMC.  Taken as a whole, these Certificates represent the entire beneficial ownership interest in the mortgage assets contained in the Trust.  Individually, however, each certificate varies in the rights of ownership and repayment granted to the holder.  Some certificates grant only the right to receive certain income from the Trust while other certificates grant ownership in the residual assets of the Trust.  The composition of the Certificates and the respective rights granted to each Certificate are governed by a Pooling and Servicing Agreement.

24.    In most BEAR STEARNS offerings, EMC acts as Master Servicer or at least provides the actual servicing of many of the securitized mortgage loans even when a different entity is acting as Master Servicer.

25.    Critical to BEAR STEARNS' perpetuation of this successful enterprise was an increasing supply of mortgage loans.  As investor demand for mortgage-backed securities created and sold by BEAR STEARNS grew so did the need for ever-increasing

---

[3]  Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2007.

CLASS ACTION COMPLAINT

numbers of loans to securitize.  BEAR STEARNS founded BSRMC in 2005 to increase originations of mortgages to feed its securitization machine.

26.    BEAR STEARNS and EMC also frequently provided lenders warehouse lines of credit to generate, to EMC's specifications, the ever-increasing volume of loans for EMC to purchase and securitize.

27.    With a corporate objective of increasing origination and securitization volume, BEAR STEARNS began to develop the Option ARM as a mass market product because it offered the lowest monthly payment, albeit a deceptively low one because the payment did not reflect the full amount of the interest being charged.

28.    BEAR STEARNS was quoted in a July 14, 2005 Reuters report as stating "no other product can compete with the low monthly payment of an Option ARM." In speaking about Option ARMs, Thomas F. Marano, global head of mortgage and asset backed securities at BEAR STEARNS told Business Week "at a price, you can originate or sell anything."  (9/11/2006)

29.    Even though OPTION ARM borrowers were not paying all the interest, defendants were able to book the "deferred interest" as income, thereby fattening up their bottom lines and bonus pools.

30.    In its 2008 Annual Report to its shareholders. JP MORGAN CHASE described Option ARM loans as "possibly the worst mortgage product."  JP MORGAN CHASE had refrained from writing these loans because "we did not think they were a consumer friendly product."

31.    Pursuant to California Civil Code § 1459 and California Code of Civil Procedure § 368, Defendants BEAR STEARNS, BS&C and EMC MORTGAGE (and Defendant JPMORGAN CHASE by virtue of its merger with BEAR STEARNS and as BEAR STEARNS' successor-in-interest) are subsequent purchasers and/or assignees of Plaintiffs' and the Class Members' Option ARM loans.  At all times relevant, Defendants are and/or were sophisticated and knowledgeable entities whose businesses included designing, originating, purchasing, packaging, securitizing and selling interests in the

CLASS ACTION COMPLAINT

1  subject Option ARM loans.  The subject Option ARM loans at issue are non-negotiable

2  instruments within the meaning of Civil Code § 1459 and at all times relevant,

3  Defendants purchased, packaged, securitized and/or sold the subject Option ARM loans

4  with full knowledge of the failures to disclose and Material Omissions as alleged herein.

5  Defendants therefore "stand in the shoes" of the assignors and originators of those

6  mortgages, taking their rights and remedies, subject to any defenses that the obligor

7  (Plaintiffs and Class Members) has against the assignor prior to notice of the assignment.

8  15 U.S.C. § 1641 provides that assignees are liable for violations that are apparent on the

9  face of disclosure documents and other assigned loan documents.

## III.

## JURISDICTION AND VENUE

12      32.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1601 *et*

13  *seq.* and 28 U.S.C. §§ 1331 and 1367(a).

14      33.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §

15  1332(d)(2), the "Class Action Fairness Act," as the amount in controversy exceeds

16  $5,000,000.00 and many Class Members are citizens of different states than Defendants.

17      34.     This Court has personal jurisdiction over the parties in this action, because

18  Defendants are corporations or other businesses duly licensed to do business in

19  California.

20      35.     Venue is proper within this District and Division pursuant to 28 U.S.C.

21  §1391(b), because a substantial part of the events and omissions giving rise to the claims

22  occurred in this District, and because there is personal jurisdiction in this District over

23  the named Defendants because they regularly conduct business in this judicial district.

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

26      36.     Defendants, and each of them, created, designed, purchased, sold,

27  distributed, serviced, owned and/or are assignees of the Option ARM loans that are the

28  subject of this Complaint.

37.     The Option ARM loans that are the subject of this Complaint are the loans created, designed, originated and/or acquired and securitized by Defendants with the following common characteristics: (i) the Monthly Payment Amount stated in the Note is based upon a low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule listed in the TILDS, for the first 3-5 years of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first 3-5 years, the amount of the monthly payments increases.

38.     Defendants knew that for Plaintiffs' and Class Members' loans, the sum of the index and the margin would necessarily result in an interest rate that always exceeded the "teaser" rate by several percentage points. As a result, after only one month, the interest accruing on the note more than doubled from an amount which was usually below 2% to an amount of at least 4%, and in some cases up to 8%. Because of this dramatic interest rate adjustment after only one month, the monthly payment, which was calculated based on a fully amortizing payment at the low teaser rate, was no longer sufficient to even pay the interest which accrued on the note, and the balance owed increases even if the payments are made as scheduled on the Note and the TILDS. This process is known as negative amortization, and Defendants knew it was *certain to occur* because of the large spread between the teaser rate and the combined index and margin. Indeed the margin alone was consistently higher than the "teaser" rate. Even if the index went down to zero, the combined total of the margin and index would never be close to the "teaser" rate, and thus the Option ARM loans at issue would always, and were designed to, cause negative amortization. Defendants never disclosed to Plaintiffs and Class Members this material information. Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

39.     Because of the way Defendants structured the Option ARM loans at issue, it was certain that, as the scheduled payments were made each month, each Class Member

CLASS ACTION COMPLAINT

1   would owe more money than he or she did at the start of the loan, and have less time to
2   pay it back.  Indeed, every time Plaintiffs and Class Members made a payment in the
3   amount reflected in the TILDS, the principal balance on their loans increased.  To make
4   matters worse, this "deferred interest" was added to the principal balance and, in turn
5   accrued more interest – in effect using compound interest to increase the balance owed
6   by each borrower.

7        40.    Although Defendants knew that negative amortization was certain to occur,
8   they never disclosed this to Plaintiffs or Class Members, who refinanced their homes and
9   entered into these loans without ever receiving this material information.  Had
10  Defendants disclosed this material information, Plaintiffs and Class Members would not
11  have purchased the subject Option ARM loans.

12       41.    The two most important pieces of information in any mortgage loan are the
13  interest rate and the amount of the monthly payments.  For the Defendants' Option ARM
14  loans, the disclosures of both pieces of this information were misleading and omitted
15  material facts.  The Loan Documents disclosed a teaser interest rate, but they did not
16  disclose that this rate would sharply increase after only one month.  The Loan
17  Documents disclosed a low monthly payment for the first 3-5 years of the loan, which
18  was based on the teaser rate, but this did not reflect the actual amount of interest being
19  charged or the amount Plaintiffs and Class Members actually owed each month.

20       42.    Plaintiffs and Class Members were not informed of the sharp increase in the
21  interest rate, and the fact that their monthly payments were not enough to pay the interest
22  accruing on the loan, until they had made multiple payments following the closing of the
23  loan, at which time they would receive a statement showing that the principal balance
24  had increased with each month that had passed since the loan closed, despite the fact that
25  the borrower had made all payments as scheduled.  Had Defendants disclosed this
26  material information, Plaintiffs and Class Members would not have purchased the
27  subject Option ARM loans.

28       43.    By the time this material information was disclosed to Plaintiffs and Class

CLASS ACTION COMPLAINT

1    Members, they were "locked" into the loan by a draconian prepayment penalty consisting

2    of a prepayment charge equal to the amount of interest that would accrue during a

3    six-month period on the amount prepaid (if the prepayment amount was greater than

4    20% of the original principal amount stated in the Note), which is to be calculated at the

5    rate of interest in effect under the terms of the Note at the time of the prepayment for a

6    prepayment occurring during the first two to three years of the loan. This draconian

7    provision was designed by Defendants to deter and prevent anyone from refinancing the

8    loan during the applicable time period.

9        44.    Before Plaintiffs and Class Members entered into the subject Option ARM

10   loans, Defendants failed to disclose and concealed the amount by which the borrowers'

11   loan balances would increase over the first two to five years of the loan, even though

12   Defendants had actually performed this calculation internally and thus knew the truth.

13   This increase in the loan balance is material information to any consumer entering into

14   these loans, because it effectively strips the homeowners of equity in their homes, and

15   greatly impairs their ability to refinance these loans once they recast to substantially

16   higher monthly payments. Thus, the loans were structured so that once borrowers were

17   given or discovered the material information, that their loans were negatively amortizing,

18   Plaintiffs and Class Members could only get out of the loans if they incurred a

19   substantial prepayment penalty, or waited two to three years, in which case they would

20   have to refinance a substantially larger principal amount. Had Defendants disclosed this

21   material information, Plaintiffs and Class Members would not have purchased the

22   subject Option ARM loans.

23       45.    Each subject Option ARM loan has so-called payment caps, which provide

24   that, even after the monthly payment increases, it will not increase by more than 7.5%

25   per year. These payment caps are, however, subject to an overall cap on principal of

26   115% of the original loan amount. Once the loan principal reaches this 115% cap, the

27   7.5% limitation on payment increases no longer applies, and the payment generally will

28   increase by more than that amount. This built-in "payment shock" is more than many

CLASS ACTION COMPLAINT

Class Members can afford and was substantially certain to put them at risk of losing their homes to foreclosure.

46.     However, the most that Defendants' Loan Documents said about negative amortization was that it "may" occur.  This was ambiguous, misleading and deceptive, because it implies that negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed the same or went down.

47.     The undisclosed fact that negative amortization is certain to occur on the subject loans and information regarding the interest rate to be charged on the loan was information that Plaintiffs and Class Members would have found material when deciding whether to purchase the subject Option ARM loans.  Despite this, Defendants never disclosed to Plaintiffs and Class Members this material information.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the subject Option ARM loans.

48.     The failure of Defendants to disclose this material information in the Loan Documents violated TILA, state consumer protection statutes, and common law, as more fully set forth below.

**Defendants TBSC, BSRMC,  EMC MORTGAGE and BS&C's**
**Participation In The Wrongful Conduct**

49.     Plaintiffs are informed, believe, and thereon allege that each of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

50.     Plaintiffs are informed, believe, and thereon allege that at all times herein mentioned, each Defendant was acting in concert or participation with each other, and/or aided and abetted the other Defendants, and/or was a joint participant and collaborator in

1  the acts complained of, and /or was the agent or employee of the others in doing the acts

2  complained of herein, each and all of them acting within the course and scope of said

3  agency and/or employment by the others, each and all of them acting in concert one with

4  the other and all together.  Each Defendant was the co-conspirator, aider and abettor,

5  agent, servant, employee, assignee and/or joint venturer of each of the other Defendants

6  and was acting within the course and scope of said conspiracy, agency, employment,

7  assignment and/or joint venture and with the permission and consent of each of the other

8  Defendants.

9       51.    At all relevant times, the Option ARM loans sold to Plaintiffs and many

10  Class Members, and the documents provided them in conjunction with those loans, were

11  devised and designed cooperatively by BSRMC, TBSC, BS&C and EMC MORTGAGE

12  as follows:

13          a.    TBSC, BS&C,  BSRMC, and EMC MORTGAGE are in the business

14              of, among other things, securitizing home mortgage loans by

15              packaging those loans into trusts or other vehicles in order to sell

16              securities to investors based on the income to be derived from those

17              loans.

18          b.    In order to increase the number of loans they could securitize, TBSC,

19              BS&C, EMC MORTGAGE and others devised a plan to have third

20              party originators such as BSRMC originated loans on their behalf.

21          c.    At the same time, BSRMC  and others needed an outlet through

22              which they could quickly dispose of the Option ARM loans it sold.

23              BSRMC and others earned income in connection with the issuance

24              and re-sale of Option ARM loans, rather than in connection with

25              servicing and holding those loans.  Because it needed to fund new

26              Option ARM loans as it issued them and because the monies

27              available to BSRMC and others for that purpose were finite and

28              needed to be regularly replenished, BSRMC and others needed

CLASS ACTION COMPLAINT

assurance that it would be able to promptly resell the Option ARM loans they originated to other institutions like EMC MORTGAGE, BS&C, other BEAR STEARNS entities and securitizers DOES.

d.   EMC MORTGAGE agreed that BSRMC would originate certain Option ARM loans to homeowners.  Pursuant to that understanding and consistent with industry practice, on information and belief, EMC MORTGAGE funded those Option ARM loans using monies available to it through its warehouse line of credit or through other means, and EMC MORTGAGE would then purchase the loans from BSRMC. and others.  Under that arrangement, BSRMC and others would collect fees from the homeowners to who took out the Option ARM loans; EMC MORTGAGE would collect revenues through the securitization process as "sponsor" of the mortgage-backed securities and in connection with servicing rights they retained on the loans after they were securitized; BS&C and others would collect fees as the underwriter of the securitization.

e.   According to SEC filings, EMC MORTGAGE'S underwriting standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgaged property as collateral.  In the loan application process, EMC MORTGAGE required prospective mortgagors to provide information regarding factors such as their assets, liabilities, income, credit history, employment history and other related items.  Thus, EMC MORTGAGE dictated the information that was required from loan applicants applying for Option ARM loans from BSRMC and others that EMC MORTGAGE would subsequently purchase.

f.   On information and belief EMC MORTGAGE, either alone or in conjunction with BS&C and/or TBSC securitization entities,

approved, and/or drafted loan and disclosure documents, including the documents at issue in this action, with the intention that they would be used and provided to Plaintiffs and Class Members in connection with Option ARM loans that BSRMC and others originated. EMC MORTGAGE and BS&C collectively approved the characteristics of the Option ARM loans that BSRMC and others originated to Plaintiffs and Class Members. In addition, EMC MORTGAGE, BEAR STEARNS, and BSRMC agreed that BSRMC and other originators would use the loan and disclosure documents EMC MORTGAGE and others selected, approved, and/or provided as a condition to EMC MORTGAGE's purchase of those loans.

g.   EMC MORTGAGE made the loan and disclosure documents they drafted available to BSRMC and others through a document service company, including a company known as Doc Magic, thereby allowing BSRMC and others to insert the material facts regarding Plaintiffs and other Class Members into the EMC MORTGAGE approved loan documents, print the loan documents and provide them to Plaintiffs.

h.   The compliance of BSRMC and other originators with this process, including its use of pre-approved loan documents, was important to the entire enterprise. It was only by using the loan documents that had been written and/or pre-approved by EMC MORTGAGE that BSRMC and others could be assured that they would be able to promptly resell the Option ARM loans it issued.

i.   BSRMC and other originators knew the contents of the loan documents they provided to Plaintiffs and Class Members and could have ensured that those documents disclosed all of the information contained in The Material Omissions. Instead of providing Plaintiffs

CLASS ACTION COMPLAINT

and Class Members with loan documents that complied with the
requirements of TILA or which contained the chose to provide
Plaintiffs and Class Members with the documents prepared, ratified,
and approved by EMC MORTGAGE, BS&C and Securitizer  DOES
1-200.

52.    The loan characteristics described above were true of the named Plaintiffs' loans and were also common characteristics of the loan forms used by Defendant BSRMC and others during the liability period.  It is these loan forms (The Loan Documents) that are the subject of this Complaint.

53.    At all relevant times, Defendants, and each of them, actively and knowingly participated and/or aided and abetted each other in this systematic scheme and otherwise conspired to sell the subject Option ARM loans as alleged herein.  BSRMC, BEAR STEARNS, EMC MORTGAGE,  BS&C and DOES 1-200 s also actively participated in creating, designing and formulating the loan documents, disclosures and dictated the terms of the Option ARM loans sold to Plaintiffs and Class Members.  Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits, irrespective of the increased risks to consumers posed by such loans.

## V.

## CLASS ACTION ALLEGATIONS

54.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure, Rules 23(a) and 23(b).  The Classes that Plaintiffs seek to represent are defined as follows:

(a)    **National TILA Class:**  All individuals in the United States of
America who, from August 28, 2006 through the date notice is
mailed to the Class, have or had an Option ARM Loan that was
sold or owned by Defendants and securitized through BEAR
STEARNS or its subsidiaries which was secured by real

CLASS ACTION COMPLAINT

property on their primary residence located within the United States.  The class is defined to include only these loans which had the following characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time.  Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives, located in the United States of America.  Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

(b)     **The California Category I Class:**  All individuals who, from August 28, 2003 through the date that notice is mailed to the Class, who have or had an Option ARM Loan that was sold or owned by Defendants and securitized through BEAR STEARNS or its subsidiaries which was secured by real property located in the State of California, the following characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the

CLASS ACTION COMPLAINT

first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time.  Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

(c)    **The California Category II Class:**  All individuals who, from August 28, 2003 through the date that notice is mailed to the Class, who have or had an Option ARM Loan that was sold or owned by Defendants and securitized through BEAR STEARNS or its subsidiaries which was secured by real property located within the United States (excluding California) and was approved by Defendants within the State of California, which loans had the following characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time.  Excluded

CLASS ACTION COMPLAINT

1    from the California Class are Defendants' employees, officers,

2    directors, agents, representatives, and their family members, as

3    well as the Court and its officers, employees, and relatives.

4  Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to

5  the Court at the appropriate time, or to propose or eliminate sub-Classes in response to

6  facts learned through discovery or legal arguments advanced by Defendants or otherwise.

7       55.   Numerosity:  The Classes are so numerous that the individual joinder of all

8  members thereof is impracticable under the circumstances of this case.  While the exact

9  number of class members is unknown at this time, Plaintiffs are informed and believe that

10  each of the proposed Classes consists of hundreds or thousands of members.

11      56.   Commonality:  Common questions of law or fact are shared by Class

12  Members.  This action is suitable for class treatment, because these common questions of

13  fact and law predominate over any individual issues.  Such common questions include,

14  but are not limited to, the following:

15       (a)    Whether The Loan Documents violated TILA;

16       (b)    Whether The Loan Documents violated 12 C.F.R. § 226.17;

17       (c)    Whether The Loan Documents violated 12 C.F.R. § 226.19;

18       (d)    Whether Defendants engaged in unfair and/or fraudulent business

19              practices that were likely to deceive Plaintiffs and Class Members

20              before and during the loan application process;

21       (e)    Whether Defendants concealed, omitted and/or otherwise failed to

22              disclose information they were mandated to disclose under TILA, state

23              consumer protection statutes, and/or the common law;

24       (f)    Whether Defendants failed to disclose to Plaintiffs and Class

25              Members, before they entered into the subject Option ARM loans, that

26              negative amortization was certain to occur if the borrowers made the

27              initial minimum monthly payments;

28       (g)    Whether BEAR STEARNS, BS&C,  EMC MORTGAGE, and other

CLASS ACTION COMPLAINT

1    subsequent purchasers and/or assignees are liable for the violations of

2    TILA as alleged herein;

3    (h)    Whether The Loan Documents are non-negotiable instruments;

4    (i)    Whether Defendants' failures to disclose material information, as

5    alleged herein, are apparent on the face of The Loan Documents;

6    (j)    Whether BEAR STEARNS, BS&C, EMC MORTGAGE, and other

7    subsequent purchasers and/or assignees are liable for the fraudulent

8    omissions and UCL violations alleged herein;

9    (k)    Whether BEAR STEARNS, BS&C, EMC MORTGAGE and others,

10   knowingly assisted and aided and abetted BSRMC and othger

11   originators  in the  scheme to sell Option ARM loans to Plaintiffs and

12   Class Members without disclosing the material information described

13   herein;

14   (l)    Whether Plaintiffs and Class Members are entitled to damages;

15   (m)    Whether Plaintiffs and Class Members are entitled to punitive

16   damages; and

17   (n)    Whether Defendants' affirmative defenses, if any, raise common

18   issues of fact or law as to Plaintiffs and Class Members as a whole.

19   57.   Typicality:  Plaintiffs' claims are typical of the claims of absent Class

20   Members.  Plaintiffs and the other Class Members were subjected to the same kind of

21   unlawful conduct and the claims of Plaintiffs and the other Class Members are based on

22   the same legal theories.

23   58.   Adequacy:  Plaintiffs are adequate representatives of the Classes, because

24   their interests do not conflict with the interests of the other members of the Classes

25   Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced

26   in complex class action litigation and Plaintiffs intend on prosecuting this action

27   vigorously.  The interests of Class Members will be fairly and adequately protected by

28   Plaintiffs and their counsel.

59. <u>Ascertainable Class</u>: The proposed Classes are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending records.

60. This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

(a) <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>: Defendants, and each of them, have acted or refused to act on grounds generally applicable to each of the Classes, thereby making final injunctive relief or corresponding declaratory relief with respect to each class as a whole appropriate; and

(b) <u>Predominant Questions of Law or Fact</u>: Questions of law or fact common to all Class Members, including those identified above, predominate over questions affecting only individual Class Members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Moreover, absent class treatment of this controversy, the amount of individual Class Members' losses in comparison to the enormous cost of litigation makes it almost certain that few Class Members would ever be able to even seek, let alone obtain, redress for their injuries.

## VI.

## **FIRST CAUSE OF ACTION**

**Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq*.**

**(Against Defendants BSRMC, EMC MORTGAGE, JP MORGAN CHASE AND DOES 1-200)**

61. Plaintiffs incorporate all preceding paragraphs as though fully set forth

24

CLASS ACTION COMPLAINT

herein.

62.     Defendants violated TILA through The Material Omissions by:  (1) failing to disclose that negative amortization was certain to occur; (2) establishing a payment schedule that was not based on the annual percentage rate (APR), but rather an interest rate that applied for at most only 30 days; (3) listing in the TILDS an APR having no relation to the monthly payment listed for the first two to five years; (4) failing to disclose that the initial interest rate listed in the Note was discounted; and (5) failing to disclose the certainty of negative amortization in The Loan Documents provided to Plaintiffs and Class Members before they entered into The Loan Documents.

63.     15 U.S.C. § 1641(a) provides for assignee liability for violations that are apparent on the face of the loan documents."  The violations of TILA and Regulation Z alleged in this Complaint are apparent on the face of the loan documents.  As a result, as purchasers and assignees of Plaintiffs' and Class Members' loans, EMC MORTGAGE is responsible and answerable for the violations alleged in this Cause of Action. Furthermore, as purchasers and assignees of Plaintiffs' and Class Members' loans, certain DOE defendants are responsible and answerable for the violations alleged in this Cause of Action.  JPMORGAN CHASE is responsible and answerable for violations of this Cause of Action as successor-in-interest to BSRMC, and to the degree subject loans have been assigned or sold to it as a result of its merger with BEAR STEARNS.

**A.    Failure to Disclose That Negative Amortization Was Certain to Occur.**

64.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans, stating as follows:

> 226.19.  Certain residential mortgage and variable-rate transactions. . . .
> (b) Certain variable-rate transactions.  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . . (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative*

1          *amortization, and interest rate carryover*. (Emphasis added.)

2       65.    In 1995, and continuing each time new Official Staff Commentary was

3  issued, the Federal Reserve Board ("FRB") made clear that when a loan was a variable

4  rate loan with payment caps, such as those that are the subject of this lawsuit, the

5  disclosure requires a definitive statement about negative amortization:

6

7                          12 CFR Part 226
               [Regulation Z; Docket No. R-0863]

8                  Monday, April 3, 1995
     AGENCY: Board of Governors of the Federal Reserve System.

9         ACTION: Final rule; official staff interpretation.
      If a consumer is given the option to cap monthly

10      payments that may result in negative amortization,
     the creditor must fully disclose the rules relating to

11      the option, including the effects of exercising the
     option (such as **negative amortization will occur**

12      and the principal balance **will increase**)... (Found
     at 12 C.F.R. Pt. 226, Supp. I, 19(b)(2)(vii)-2

13      (emphasis added).

14      66.    At all times relevant, statutory and common law in effect make it unlawful

15 for a lender, such as Defendants, to fail to comply with the FRB's Official Staff

16 Commentary as well as Regulation Z and TILA.

17      67.    Defendants were aware, or should have been aware, that this loan product

18 had a variable rate with payment caps and that The Loan Documents were deficient

19 because of The Material Omissions, defined above, including that negative amortization

20 was a certainty. On information and belief, Defendants were aware of the guaranteed

21 negative amortization, because they accrued the negative amortization as income for

22 accounting and/or tax purposes. Defendants were also aware the negative amortization

23 was certain to occur, because, in computing the total finance charge payable over the full

24 life of the loan for purposes of compiling the TILDS, they included the interest on

25 "deferred interest" which would accrue because the scheduled payments were insufficient

26 to pay all interest due on the loan. The TILDS, however, did not disclose the fact that

27 negative amortization was a certainty, or the amount of the total finance charge that

28 resulted from this negative amortization.

CLASS ACTION COMPLAINT

68.     The only places in the Notes that even inferentially reference negative amortization suggest that negative amortization is only a mere possibility, rather than an absolute certainty.  For instance, the Notes, at ¶ 5(a) state that "*If* the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect.  This practice is known as negative amortization." And, ¶ 5(c) which state "For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal," were half-truths, because the Note  did not state that the payment schedule provided would absolutely guarantee that negative amortization was going to occur on these loans.

69.     Had Defendants disclosed to Plaintiffs and the Class members that negative amortization was certain to occur if the payment schedule in the TILDS was followed, Plaintiffs and the Class members would not have entered into the loans.

**B.      Failure to Disclose the Interest Rate Underlying the Payment Schedule.**

70.     Additionally, 12 C.F.R. §§ 226.17 and 226.19 require the lender to make disclosures concerning the payments in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose at all.

71.     The scheduled payment amounts and interest rate listed in the Note and TILDS for each of the subject loans are unclear, because the payment amounts for the first three to five years are not based on the APR listed in the TILDS, but, instead, are based upon a rate listed in the Note that Defendants knew would exist for only thirty (30) days.  At all times relevant, The Loan Documents failed to disclose that even if Plaintiffs and Class Members made payments according to the payment schedule set forth in the TILDS, negative amortization was an absolute certainty.  Had Defendants clearly and conspicuously disclosed the payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment amounts would have been approximately double the

27

1    payment amounts listed.

2        72.    Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states: "This

3    standard requires that disclosures be in a reasonably understandable form.  For example,

4    while the regulation requires no mathematical progression or format, the disclosures must

5    be presented in a way that does not obscure the relationship of the terms to each other…"

6        73.    At all times relevant, The Loan Documents of the Defendants violated 12

7    C.F.R. § 226.17(a)(1) in that the relationship between the payments, for up to the first

8    five years of the loans, bear no relationship to the APR listed in the TILDS.  Therefore,

9    the form of disclosure used by Defendants obscured the relationship between the interest

10   rate listed in the Notes and the APR listed in the TILDS and the monthly payments listed

11   in the payment schedule.

12       **C.      Failure to Disclose That the Initial Interest Rate Was Discounted.**

13       74.    12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the

14   terms of the legal obligation between the parties."  Official Staff Commentary regarding

15   12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the credit terms to

16   which the parties are legally bound as of the outset of the transaction.  In the case of

17   disclosures required under  § 226.20(c), the disclosures shall reflect the credit terms to

18   which the parties are legally bound when the disclosures are provided."  The Official

19   Staff Commentary further states that "[t]he legal obligation normally is presumed to be

20   contained in the note or contract that evidences the agreement."  Official Staff

21   Commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a rate or payment

22   cap that would prevent the initial rate or payment, at the time of the first adjustment, from

23   changing to the rate determined by the index or formula at consummation, the effect of

24   that rate or payment cap should be reflected in the disclosures."

25       75.    At all times relevant during the liability period, The Loan Documents

26   violated 12 C.F.R. § 226.17(c) in that the Notes and TILDS did not disclose that the

27   liability that Plaintiffs and Class Members were incurring was substantially greater than

28   the amount of their scheduled payments.  Further, Defendants failed to disclose to

CLASS ACTION COMPLAINT

Plaintiffs and Class Members that the initial interest rate was discounted, and that it was absolutely certain to substantially increase after only one month, even when the index did not rise. To the extent that Defendants provided any disclosure that stated that the initial payment was not based on the index, they failed to do so in a manner that was clear and conspicuous, and that did not obscure its importance, or that was designed to be reasonably understood by the ordinary consumer. Rather than disclose that the interest rate would increase after only one month, The Loan Documents stated that the initial payment was based on a "yearly rate" of 1-3%. The Loan Documents did not clearly and unambiguously disclose that this initial rate was discounted, and would only last for one month.

**D.    Failure to Clearly and Conspicuously Disclose the Actual Interest Rate.**

76.    Defendants also failed to disclose to Plaintiffs and Class Members before they entered into the subject Option ARM loans all of the ways by which the interest rate applicable to the subject loans could increase, in violation of TILA.

77.    The foregoing violated 15 U.S.C. § 1638(a)(4), which requires lenders to disclose only one annual percentage rate ("APR") and not an additional APR that is only applicable for the first 30 days of a loan.

78.    It also violates the FRB's Commentary to 12 C.F.R. § 226.(17)(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

79.    It violates 15 U.S.C. § 1638(a)(8) and 12 C.F.R. § 226.18(e), which requires lenders to provide a descriptive explanation of the APR, which is defined as the cost of credit expressed as a yearly rate.

80.    It violates 12 C.F.R. § 226.17 (and the commentary thereto) and 12 C.F.R. § 226.19, which, together, require lenders to make disclosures concerning the APR in a clear and conspicuous manner; under TILA, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

CLASS ACTION COMPLAINT

81.     At all times relevant during the liability period, Defendants provided Plaintiffs and Class Members with Notes that state: "I will pay interest at a yearly rate of [1.000% - 3.000%]."  However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE" describes the APR as "[t]he cost of your credit as a yearly rate" and then lists a much higher APR than the rate listed in the Notes.  For instance, in the case of Plaintiffs Mr. and Mrs. Monaco, it listed an APR of "7.527%" and for Plaintiff Mr. Brandt, it listed an APR of "8.871%."

82.     Thus, the listed rate in the Notes actually conflicted with the APR stated in the TILDS.  For instance, in the case of Plaintiffs Mr. and Mrs. Monaco, the "1.000%" stated in the Note contradicts the "7.527%" APR that Defendants stated in the TILDS. And for Plaintiff Mr. Brandt, the "1.000%" stated in the Note contradicts the "8.871%" APR that Defendants stated in the TILDS.

83.     At all times relevant during the liability period, Defendants failed to clearly and conspicuously explain in the Note or TILDS that the low rate (the same rate upon which Defendants based the written payment schedules provided to Plaintiffs and Class Members) was offered only for the first thirty (30) days of the loan.

84.     Defendants also failed to disclose to Plaintiffs and Class Members that the APR listed in the TILDS was not the APR or rate used to determine the first two to five years of payments listed in the very same TILDS, and that the listed payment amounts for the first two to five years of the loan were based on the interest rate stated in the Note, an interest rate which was correct for no more than thirty days.

85.     The FRB's commentary to 12 C.F.R. § 226.17(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."  Additionally,

> in a variable-rate transaction with a...discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate

CLASS ACTION COMPLAINT

1    feature for the remainder of the term.

2        86.    The reason for this requirement is clear.  Consumers cannot make an

3    informed decision when they cannot compare the cost of credit to other proposals.  It

4    therefore was incumbent upon Defendants to disclose to Plaintiffs and the Class members

5    *before* they entered into the subject Option ARM loans the composite interest rate, and

6    the amount of payments based thereon, so that these borrowers could understand exactly

7    what they would be paying for the loan.

8        87.    For EMC MORTGAGE and the other Defendants who are in the business of

9    making, purchasing and securitizing loans, the violations of TILA and Regulation Z

10   described in this Complaint are objectively and  reasonably apparent on the face of the

11   documents provided to Plaintiffs and Class Members, because the disclosures provided

12   can be determined to be incomplete and inaccurate by a comparison among the TILDS,

13   the other disclosure statements, and the Note described herein.

14       88.    As a direct and proximate result of Defendants' violations of TILA and its

15   implementing regulations, Plaintiffs and Class Members have suffered injury in an

16   amount to be determined at the time of trial.

17       89.    WHEREFORE, Plaintiffs and Class Members are entitled to an order

18   declaring that Defendants violated TILA, 15 U.S.C. §1601, et seq., that Plaintiff Mr.

19   Brandt and the similarly situated Class members are entitled to statutory damages

20   pursuant to 15 U.S.C. § 1640, attorneys fees, litigation costs and expenses and costs of

21   suit, for an order rescinding Plaintiffs' and Class Members' individual mortgages, and for

22   an order awarding other relief as the Court deems just and proper.

23   **VII.**

24   **<u>SECOND CAUSE OF ACTION</u>**

25   **Fraudulent Omissions**

26   **(Against All Defendants)**

27       90.    Plaintiffs incorporate all preceding paragraphs as though fully set forth

28   herein.

91.     As alleged above, under TILA, Defendants had a duty to clearly and conspicuously disclose to Plaintiffs and each Class Member before they entered into the subject Option ARM loans: (i) the payment schedule for the first three to five years was not based upon the APR listed on the TILDS, (ii) that negative amortization would occur and that the "principal balance will increase"; (iii) that the initial interest rate on the note was discounted; and (iv) the applicable annual percentage rate ("APR").

92.     Under common law, Defendants further had a duty to disclose to Plaintiffs, and Class Members that: (i) the promised low interest rate was only available for thirty days if at all; (ii) the payment rate for the first three to five years provided to Plaintiffs and Class Members on the TILDS was insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members' residences was certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants.

93.     BSRMC and certain DOE defendants are liable under this Cause of Action because it was the originator of Plaintiffs' loans and provided the deficient loan documents and disclosures to Plaintiffs and Class Members while concealing and omitting material information as alleged herein. EMC MORTGAGE, BEAR STEARNS and BS&C and certain DOE defendants are liable under this Cause of Action (1) as a result of their participation in a scheme wherein they provided BSRMC and other originators with the deficient loan documents and disclosures, and directed BSRMC to use those disclosures, despite the Material Omissions, (2) to the degree they provided the deficient loan documents and disclosures to Plaintiffs and Class Members directly, and (3) because they are also responsible as purchasers and assignees of Plaintiffs' and Class Members' loans, and (4) because their role in securitizing the mortgages was essential to the ability of BSRMC and others to originate new mortgages. JPMORGAN CHASE is liable for violations of this Cause of Action as BSRMC's successor-in-interest and to the

1  degree subject loans have been assigned or sold to it as a result of its merger with BEAR

2  STEARNS.

3       94.    Each of the Notes at issue states:  "I will pay **principal and interest** by

4  making a payment every month." (Emphasis added.)  The Note then states, while

5  referencing the Payment Cap provision, that "[t]his Payment Cap applies only to the

6  **Principal and Interest** payment ..."  And, under the heading "BORROWERS FAILURE

7  TO PAY AS REQUIRED," the Note states "[t]he amount of the charge will be 5.000% of

8  my overdue payment of **Principal and Interest**." (Emphasis added.)   These partial

9  representations failed to disclose that the payment amounts prescribed in The Loan

10  Documents were certain to result in negative amortization.

11       95.    The Notes further state: "**If** the Minimum Payment is not sufficient" then

12  negative amortization may occur." (Emphasis added).  However, The Loan Documents

13  fail to disclose the material fact that the amount set forth in the payment schedules

14  provided by Defendants in the TILDS could not possibly cover the amount of interest due

15  under *any* conceivable index rate plus the margin after the first 30 days.  To be accurate

16  and complete, the Notes should have disclosed that if the borrowers followed the payment

17  schedules set forth by Defendants, the Monthly Payments *would not* cover the amount of

18  interest due and negative amortization *would in fact* occur.

19       96.    The Notes further state, under "Additional Payment Options" that the

20  "Lender may provide me with up to three (3) additional payment options ...."  However,

21  the so-called "Payment Options" that the lender "may provide" were not disclosed to

22  Plaintiffs and Class members *before* they entered into the subject Option ARM loans;

23  rather, it was only after Plaintiffs and Class Members entered into the loans that they were

24  provided crucial material information about the true cost of their loans, and by then, it

25  was too late as the borrowers were already hooked into the loans, with their

26  accompanying heavy prepayment penalties.

27       97.    The Notes list an interest rate and a payment amount based on that initial

28  interest rate.  However, the TILDS that Defendants gave to Plaintiffs and Class Members

CLASS ACTION COMPLAINT

before they entered into the subject loans included a schedule of payments (including that initial payment rate) but disclosed a different, much higher interest rate.  By stating the low teaser rate and associated monthly payment in the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were going to accrue on their loans.

98.    The Notes further state, under "Amount of My Initial Monthly Payments" "Each of my initial monthly payments until the first Payment Change Date will be ...." and then it states "This amount *may* change...."  (Emphasis added).  However, under the terms of the subject Option ARM loan, Plaintiffs' and Class Member's loan "payment" was *absolutely guaranteed to go up the very next month*.   In particular, Defendants' Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount to pay for the loan was absolutely guaranteed to go up.

99.    Defendants purposefully and intentionally devised this Option ARM loan scheme of stating only partially true facts and omitting important material information in order to deceive consumers into believing that these loans would provide a low-interest rate loan for the first two (2) to five (5) years of the Note and that if they made their payments according to the payment schedule provided by Defendants their payments would be sufficient to pay both principal and interest.

100.    Defendants designed, created, supplied, or were aware of the TILDS which set forth low payments for the first two to five years of the loan.   Defendants further knew, but did not clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days.  Defendants knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew, but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original

principal balance.   This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.   Defendants could have easily disclosed, and should have accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 115% of the balance of the original financed amount, rather than merely the balance of the original amount financed.   But Defendants chose not to do so in furtherance of their scheme as alleged herein.

101.   At all times relevant, Defendants had exclusive knowledge of these materials facts, but actively concealed the material facts from Plaintiff and Class Members.

102.   The omitted information, as alleged herein, was objectively material to both the interest rate and the amount of payments, which are the two most important features of any mortgage loan.  Had Defendants disclosed this information, Plaintiffs and Class Members would not have purchased the loan products.

103.   As a direct and proximate result of Defendants' failures to disclose and omission of material facts, as alleged herein, Plaintiffs and Class Members have suffered damages, which include, but are not limited to the loss of equity Plaintiffs and each Class Member had in their homes prior to entering these loans.

104.   The wrongful conduct of Defendants, as alleged herein, including Defendants' placing of their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants

CLASS ACTION COMPLAINT

1   thereby acted with malice and complete indifference to and/or conscious disregard for the

2   rights and safety of others, including Plaintiffs and the general public.  Accordingly,

3   Plaintiffs and Class Members are entitled to an award of punitive damages against

4   Defendants in an amount to deter them from similar conduct in the future.

5       105.   WHEREFORE, Plaintiffs and Class Members are entitled to all legal and

6   equitable remedies provided by law, including but not limited to actual damages,

7   exemplary damages, prejudgment interest and costs.

8                               **VIII.**

9                   **THIRD CAUSE OF ACTION**

10          **Violation of California's Unfair Competition Law,**

11              **Bus. & Prof. Code §§ 17200 _et. seq._**

12   **"Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices**

13                  **(Against All Defendants)**

14      106.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set

15   forth herein.

16      107.   Plaintiffs bring this cause of action on behalf of themselves, on behalf of the

17   Class Members, and in their capacity as private attorneys general against all Defendants

18   for their unlawful, unfair, fraudulent and/or deceptive business acts and/or practices

19   pursuant to the California Business & Professions Code section 17200 _et seq._ ("UCL")

20   which prohibits all unlawful, unfair and/or fraudulent business acts and/or practices.

21      108.   Plaintiffs assert these claims as they are representatives of an aggrieved

22   group and as  private attorneys general on behalf of the general public and other persons

23   who have expended funds that the Defendants should be required to pay or reimburse

24   under the restitutionary remedy provided by California Business & Professions Code §§

25   17200, _et seq._

26      109.   The instant claim is predicated on the generally applicable duty of any

27   contracting party to not omit material facts, and on the duty to refrain from unlawful,

28   unfair and deceptive business practices.  Plaintiffs and Class Members hereby seek to

CLASS ACTION COMPLAINT

enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

110.   Plaintiffs and Class Members were consumers who applied for a mortgage loan through Defendants.  During the loan application process, in each case, Defendants uniformly failed to disclose and omitted material information that was known only to Defendants and that could not reasonably have been discovered by Plaintiffs and Class Members as set forth in the preceding causes of action.

111.   Based on The Material Omissions and Defendants' other partially true statements and failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their homes through the subject Option ARM loans, and have been actually harmed.

112.   Defendants intended that Plaintiffs and Class Members would be misled into believing that, if they made payments based on the payment schedules provided to them before they entered into the subject loan, the principal balance would be reduced with each payment when it actually increased with each payment.  The Loan Documents were designed and used for this purpose.

113.   Defendants designed, created, supplied, or were aware of the TILDS which set forth low payments for the first two to five years of the loan.   Defendants further knew, but did not clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days. Defendants knew, but did not disclose, that negative amortization was *guaranteed* if borrowers made these listed low payments.   Defendants further knew, but did not disclose, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original principal balance.   This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments

necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.  Defendants could have easily disclosed, and should have accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 115% of the balance of the original financed amount, rather than merely the balance of the original amount financed.  But Defendants chose not to do so in furtherance of their unfair and misleading scheme.

114.   By engaging in the above-described acts and practices, Defendants, and each of them, have committed one or more acts of unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq.*

115.   Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage over their competitors.

116.   <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.  Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said predicate acts are therefore *per se* violations of §17200, *et seq*.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:  Truth-in-Lending Act Laws ("TILA"), 15 U.S.C. §1601, *et seq.* as alleged in § II above;  Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41-58, California Civil Code §§ 1572 (Actual Fraud - Omissions), 1573 (Constructive Fraud by Omission), 1710 (Deceit) and breach of contract (as alleged in paragraphs 128-133, below).

117.   <u>Unfair</u>:  Defendants' omissions and misconduct as alleged in this action constitutes negligence and other tortious conduct and this misconduct gave Defendants an unfair competitive advantage over their competitors.

118.   Defendants' misconduct as alleged in The Material Omissions and otherwise alleged herein was unfair because (i) it caused Plaintiffs and Class Members substantial

injury by, among other things, causing them to lose equity in their homes, (ii) there were absolutely no countervailing benefits to consumers or to competition that could possibly outweigh this substantial injury, and (iii) this injury could not have been avoided or even discovered by the consumers, because it resulted from Defendants' failure to disclose and/or omission of material information that only the Defendants knew or should have known.

119.    The Material Omissions and other misconduct of Defendants alleged herein is and was likely to deceive the public, and in fact did deceive the public, and violated the public policy of the State of California.

120.    The harm to Plaintiffs, members of the general public and Class Members outweighs the utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein constitutes an unfair business act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.  Defendants' misconduct as alleged herein gave also Defendants an unfair competitive advantage over Defendants' competitors that did not engage in similar conduct.

121.    <u>Fraudulent</u>: Through their omissions and/or acts, practices and non-disclosures as alleged herein, Defendants designed The Loan Documents in order to deceive the public through the Material Omissions  leading to consumer confusion, including, but not limited to the fact that, for the first two to five years, the loans were negatively amortizing loans.  Said omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.

122.    Defendants' conduct, as fully described above, was designed to and was therefore likely to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

123.    As a direct and proximate result of the aforementioned omissions, acts and practices, Defendants, and each of them, received monies and continue to hold the monies

CLASS ACTION COMPLAINT

1   expended by Plaintiffs and Class Members similarly situated who purchased the ARM

2   loans as described herein.

3       124.   The unfair, deceptive and/or fraudulent business practices of Defendants, as

4   fully described herein, present a continuing threat to members of the public to be mislead

5   and/or deceived by Defendants' loan forms at issue, as described herein.  Plaintiffs and

6   other members of the general public have no other remedy of law that will prevent

7   Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

8       125.   As a direct and proximate result of Defendants' unfair and/or fraudulent

9   conduct alleged herein, Plaintiffs and Class Members have lost hundreds of thousands if

10  not millions of dollars of equity in their homes.  Plaintiffs and Class Members are direct

11  victims of the Defendants' unlawful conduct, and each has suffered injury in fact, and has

12  lost money or property as a result of Defendants' unfair competition.

13      126.   WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief,

14  including restitution, restitutionary disgorgement of all profits accruing to Defendants

15  because of their unfair, fraudulent, and deceptive acts and/or practices, attorney's fees and

16  costs, declaratory relief, and a permanent injunction enjoining Defendants from their

17  unfair, fraudulent and deceitful activity.

18  **IX.**

19  **FOURTH CAUSE OF ACTION**

20  **Breach of Contract**

21  **(Against All Defendants)**

22      127.   Plaintiffs incorporate all preceding paragraphs as though fully set forth

23  herein.

24      128.   Plaintiffs and Class Members entered into a written home loan agreement –

25  the contract or Note – with Defendants which describe terms and respective obligations

26  applicable to the parties herein.

27      129.   Defendants drafted the Notes and did not allow Plaintiffs or Class Members

28  any opportunity to make changes to the Notes and, due to Defendants' superior

CLASS ACTION COMPLAINT

1   bargaining position, the Notes were offered on a "take it or leave it" basis. As such, the

2   Notes and the prepayment penalty riders to the Notes are contracts of adhesion.

3       130.  Each Note and TILDS expressly and impliedly required Defendants to apply

4   Plaintiffs' and Class Members monthly payments to both principal and interest on a fully-

5   amortized basis (*i.e.*, so that negative amortization would not occur) as long as those

6   payments were in the amount reflecting in the Note and the TILDS. The Notes and the

7   TILDS identified the monthly payments Plaintiffs and the Class Members were required

8   to make. Defendants were not permitted to impose or charge any different payment

9   amount. As alleged herein, the Notes expressly state and/or imply that those payments

10   would be applied to pay both Principal and interest on the loan.

11       131.  Once Plaintiffs and Class Members entered into these loans, Defendants

12   switched the interest rate charged on the loans to a much higher rate than the one they

13   promised to Plaintiffs and Class Members as a "yearly rate." They also demanded

14   payments in amounts that exceeded those permitted by the Notes.

15       132.  As a result of Defendants' breach of the agreement, Plaintiffs and Class

16   Members have suffered harm. Plaintiffs and Class Members have incurred and will

17   continue to incur additional interest charges on the principal loan balance and surplus

18   interest added to Plaintiffs' and Class Members' principal loan balance. Furthermore,

19   Defendants' breach has placed Plaintiffs and Class Members in danger of losing their

20   homes through foreclosure, as Defendants have caused Plaintiffs' and Class Members'

21   principal loan balances to increase and limited these consumers' ability to make their

22   future house payments or obtain alternative home loan financing.

23       133.  At all times relevant, there existed a gross inequality of bargaining power

24   between the parties to The Loan Documents. At all times relevant, Defendants

25   unreasonably and unconscionably exploited their superior bargaining position and foisted

26   upon Plaintiffs and Class Members extremely harsh, one-sided provisions in the contract,

27   which Plaintiffs and Class Members were not made aware of and could not reasonably

28   have comprehended (*e.g.*, Defendants' fraud and failures to disclose as alleged herein),

CLASS ACTION COMPLAINT

and which attempt to severely limit Defendants' obligations under the contracts at the expense of Plaintiffs and Class Members, as alleged herein.

134.   WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## X.

## FIFTH CAUSE OF ACTION

## Tortiuous Breach of Implied Covenant of Good Faith and Fair Dealing
## (Against All Defendants)

135.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

136.   As a direct and proximate result of the omissions and failures to disclose as alleged herein, Plaintiffs and the Class members reasonably expected that their payments, for the first two (2) to five (5) years of the Defendants' loans at issue would decrease the balance due under the loans, rather than increase them.

158.   At all times relevant during the liability period, Defendants consciously and deliberately failed to apply Plaintiffs' and Class Members' payments in accordance with the reasonable expectations of Plaintiffs and the Class Members and uniformly misapplied the payments therein, which unfairly frustrated the agreed common purposes and disappointed the reasonable expectations of Plaintiffs and Class Members.

137.   Defendants uniformly and unfairly interfered with Plaintiffs' and Class Members' rights to receive the principal benefit of the contract, *i.e.*, ownership of their homes.  Defendants' loans have stripped away a substantial portion of the equity Plaintiffs and Class Members had in their homes and, in some cases, have actually resulted in the complete loss of their homes through foreclosure.

138.   Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about the ARM loans, and

CLASS ACTION COMPLAINT

otherwise sold these ARM loans throughout the United States, including the State of California.

139.   Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and the general public.

140.   At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

141.   As a result of Defendants' conduct, Plaintiffs and Class Members have suffered harm.  Plaintiffs and Class Members have incurred additional charges to their principal loan balance.  Plaintiffs and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class Members' principal loan balance.  Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and Class Members in danger of losing their homes through foreclosure and limited these consumers' ability to  obtain alternative home loan financing.

142.   WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

# XI.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all Class Members pray for judgment against each Defendant, jointly and severally, as follows:

A.  An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent each of the Classes;

B.  For actual damages according to proof;

C.  For compensatory damages as permitted by law;

D.  For statutory damages as permitted by law;

E.  For punitive damages as permitted by law;

F.  For rescission of the named Plaintiffs' individual loans;

G.  For equitable relief, including restitution;

H.  For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

I.  For interest as permitted by law;

J.  For declaratory relief;

K.  For injunctive relief;

L.  For reasonable attorneys' fees and costs; and

M.  For such other relief as is just and proper.

DATED: July 24, 2009          KABATECK BROWN KELLNER LLP

By: _____
Brian S. Kabateck, Esq.
Richard L. Kellner, Esq.
644 South Figueroa Street
Los Angeles, California 90017
Tel: (213) 217-5000
Fax: (213) 217-5010

WILLIAMS CUKER & BEREZOFSKY
Mark R. Cuker (*Pro Hac Vice* App. Pending)
Michael J. Quirk (*Pro Hac Vice* App. Pending)
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA 19103-1819
Phone: (215) 557-0099
Fax:    (215) 557-0673

SMOGER & ASSOCIATES
Gerson H. Smoger, Esq.
Steven M. Bronson, Esq.

44

CLASS ACTION COMPLAINT

3175 Monterey Blvd
Oakland, CA, 94602-3560
Phone:  (510) 531-4529
Fax:      (510) 531-4377

David M. Arbogast, Esq.
Jeffrey K. Berns, Esq.
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356.
Phone: (818) 961-2000
Fax:     (818) 654-5988

Eric M. George (SBN 166403)
Michael A. Bowse (SBN 189659)
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Phone: (310) 274-7100
Fax:     (310) 275-5697

Attorneys for Plaintiffs and all others Similarly
Situated

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED: July 24, 2009                    KABATECK BROWN KELLNER LLP

By: _____
       Brian S. Kabateck, Esq.
       Richard L. Kellner, Esq.
       644 South Figueroa Street
       Los Angeles, California 90017
       Tel: (213) 217-5000
       Fax: (213) 217-5010

**WILLIAMS CUKER & BEREZOFSKY**
Mark R. Cuker (*Pro Hac Vice* App. Pending)
Michael J. Quirk (*Pro Hac Vice* App. Pending)
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA 19103-1819
Phone: (215) 557-0099
Fax:     (215) 557-0673

**SMOGER & ASSOCIATES**
Steven M. Bronson, Esq.
3175 Monterey Blvd
Oakland, CA, 94602-3560
Phone:  (510) 531-4529
Fax:     (510) 531-4377

David M. Arbogast, Esq.
Jeffrey K. Berns, Esq.
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356.
Phone: (818) 961-2000
Fax:     (818) 654-5988

Eric M. George (SBN 166403)
Michael A. Bowse (SBN 189659)
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Phone: (310) 274-7100
Fax:     (310) 275-5697

Attorneys for Plaintiffs and all others Similarly
Situated

46

# EXHIBIT NO. 1

EXHIBIT 1

 

# ADJUSTABLE RATE NOTE
### (12-month average yield on actively traded US Treasury Securities --Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY RATE CHANGES AND ANNUAL PAYMENT CHANGES. THIS NOTE ALLOWS ME TO CAP MY PAYMENTS. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).

April 10, 2006          Orange                    CA
[Date]                  [City]                    [State]

2804 Paxton Avenue, Palmdale, CA  93551
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $258,000.00 (this amount is called "Principal"), plus interest, to the order of Lender.  Lender is Bear Stearns Residential Mortgage Corporation. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

## 3.    PAYMENTS

### (A)    Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 01, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 600 Anton Boulevard, Suite 1224, Costa Mesa, CA  92626 or at a different place if required by the Note Holder.

### (B)    Amount of My Initial Monthly Payments

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 1 of 6)



EMC-JM 00136



Each of my initial monthly payments will be in the amount of U.S. $829.83. This amount may change.

### (C)   Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

### 4.   ADJUSTABLE INTEREST RATE

#### (A)   Interest Rate Change Dates

The interest rate I will pay will change on the 1st day of June, 2006, and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

#### (B)   The Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

#### (C)   Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three And Fifty   Hundredths percentage points (3.500%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

Limits on Interest Rate Changes

My interest rate will never be greater than 9.950%. My interest rate will never be lower than 3.500%.

#### (E)   Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date.

### 5.   PAYMENT CHANGES

#### (A)   Payment Change Dates

My monthly payment may change as required by Section 5(B) below beginning on the 1st day of June, 2007, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 2 of 6)



 

will accept for my monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

**(B)    Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E) or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

**(C)    Additions to My Unpaid Principal**

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5 (B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

**(D)    Limit on My Unpaid Principal; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

**(E)    Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(F)    Additional Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index                                                    (page 3 of 6)
BSR 4004





(i)  Interest Only Payment: Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  Fully Amortized Payment:  Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  15 Year Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

(G)    Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

6.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

7.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

8.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A)    Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 5.000% of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 4 of 6)





**(B)     Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)     Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)     No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**9.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**10.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**11.     WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 5 of 6)*





Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

.................................................................... (Seal)
-Borrower  Joseph A. Monaco, Jr

.................................................................... (Seal)
-Borrower

.................................................................... (Seal)
-Borrower

.................................................................... (Seal)
-Borrower

[Sign Original Only]

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 6 of 6)*



## TRUTH IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

**Bear Stearns Residential Mortgage Corporation**
**600 Anton Boulevard, Suite 1224**
**Costa Mesa, CA  92626**

BORROWERS: **Joseph A. Monaco, Jr**

[X] Preliminary    [ ] Final

DATE: **04/10/2006**
LOAN NO.: **14891584**
Type of Loan: **Conventional**
APP NO.: **14891584**

ADDRESS: **2804 Paxton Avenue**
CITY/STATE/ZIP: **Palmdale, CA   93551**
PROPERTY: **2804 Paxton Avenue, Palmdale, CA  93551**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **7.527** % | $ **460,347.00** | $ **251,301.84** | $ **711,648.84** |

**PAYMENT SCHEDULE:**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 12 | $839.03 | 06/01/2006 | | | |
| 12 | $958.98 | 06/01/2008 | | | |
| 12 | $1,030.93 | 06/01/2009 | | | |
| 12 | $1,108.21 | 06/01/2010 | | | |
| 306 | $2,158.36 | 12/01/2010 | | | |

**DEMAND FEATURE:** [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE: THE CURRENT INDEX RATE IS 3.888%**
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:**  You are giving a security interest in the property located at: **2804 Paxton Avenue, Palmdale, CA  93551**

**ASSUMPTION:**   Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:**   $ **\*\*See HUD1**

**PROPERTY INSURANCE:**   [X] Property hazard insurance in the amount of **$258,000.00**   with a mortgage clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance [ ] is [ ] is not available through the lender at an estimated cost of ____ for a ____ year term.

**LATE CHARGES:**   If your payment is more than **15** days late, you will be charged a late charge of **5.000** % of the overdue payment.

**PREPAYMENT:**   If you pay off your loan early, you
[X] may  [ ] will not   have to pay a penalty.
[ ] may  [X] will not   be entitled to a refund of part of the finance charge.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**
**e means estimate**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
Joseph A. Monaco, Jr          BORROWER/DATE

_____
BORROWER/DATE

_____
BORROWER/DATE

_____
BORROWER/DATE

14891584          **\*\*e means estimate\*\***          14891584

VMP-788 (0310)
2003 CRF Systems, Inc.  The contents of this form in whole or in part are protected under the copyright laws of the United States.

VMP Mortgage Solutions (800)521-7291          Page 1 of 2          10/03

EMC-JM 00132



## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

14891584                                                                                    14891584

-788 (0310)                          Page 2 of 2                        Initials:_____

EMC-JM 00133



Loan No. 14891584

## PREPAYMENT RIDER
### (Multi-State)

MIN  100366100002123214

This Prepayment Rider is made this 10th day of April, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Debt Instrument") to Bear Stearns Residential Mortgage Corp (the "Lender") of the same date and covering the property described in the Security Instrument and located at

2804 Paxton Avenue
Palmdale, CA  93551
(the "Property")

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Debt Instrument, any addenda to the Debt Instrument or the Security Instrument, Borrower and Lender covenant, and agree as follows:

Subject to the prepayment penalty provided below, I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid principal due under the Debt Instrument. A payment of only part of the unpaid principal is known as a "partial prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payment due under the Debt Instrument.

If, within the 36 - month period beginning with the date I execute the Debt Instrument (the "Penalty Period"), I make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, I will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of (a) the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Debt Instrument, calculated at the rate of interest in effect under the terms of the Debt Instrument at the time of the prepayment; or (b) the maximum allowable prepayment penalty permitted by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

BSR 1024 Prepay Rider- Hard

THIS CERTIFIED TO BE A TRUE AND SOPY OF THE ORIGINAL DOCUMENT

The Note Holder will apply all prepayments to reduce the amount of principal that I owe under the Debt Instrument. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of the Debt Instrument. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If the Debt Instrument is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase. If the Debt Instrument is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge. Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Security Instrument are unchanged and remain in full force and effect.

**BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of the Rider.**

_____ (Seal)   _____ (Seal)
Joseph A. Monaco, Jr        Borrower                                   Borrower

_____ (Seal)   _____ (Seal)
Anita M. Monaco             Borrower                                   Borrower

_____ (Seal)   _____ (Seal)
                            Borrower                                   Borrower

_____ (Seal)   _____ (Seal)
                            Borrower                                   Borrower

BSR 1024 Prepay Rider- Hard



# EXHIBIT NO. 2

EXHIBIT 2

# ADJUSTABLE RATE NOTE
### (12-month average yield on actively traded US Treasury Securities —Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY RATE CHANGES AND ANNUAL PAYMENT CHANGES. THIS NOTE ALLOWS ME TO CAP MY PAYMENTS. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).

April 24, 2007      SANTA CLARITA      CA

[Date]      [City]      [State]

25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355

[Property Address]

25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355

[Borrower's Current Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $344,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Bear Stearns Residential Mortgage Corporation located at 1241 E Dyer Road, Suite 110, Santa Ana, CA 92705. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

### 3.    PAYMENTS

(A)    Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 01, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PMT Processing Dept, P. O. Box 225749, Dallas, TX  75222-5749 or at a different place if required by the Note Holder.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 1 of 4)*



CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

(B)     Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,106.44. This amount may change.

(C)     Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

4.     ADJUSTABLE INTEREST RATE

(A)     Interest Rate Change Dates

The interest rate I will pay will change on the 1st day of June, 2007, and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

(B)     The Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C)     Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three And Seventy Five Hundredths percentage points (3.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

Limits on Interest Rate Changes

My interest rate will never be greater than 9.950%. My interest rate will never be lower than 3.750%.

(E)     Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date.

5.     PAYMENT CHANGES

(A)     Payment Change Dates

My monthly payment may change as required by Section 5(B) below beginning on the 1st day of June, 2008, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 3 of 6)*

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

will accept for my monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

(B)    Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E) or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

(C)    Additions to My Unpaid Principal

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5 (B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

(D)    Limit on My Unpaid Principal; Increased Minimum Payment

My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

(E)    Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(F)    Additional Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 3 of 4)*

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

(i) Interest Only Payment: Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) Fully Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) 15 Year Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

(G)     Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

6.      BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

7.      LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

8.      BORROWER'S FAILURE TO PAY AS REQUIRED

(A)     Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 4 of 6)*

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

(B)     Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)     Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)     No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

9.      GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

10.     OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

11.     WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

12.     UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 5 of 8)*

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


..................................................................  (Seal)
-Borrower  JAMES A BRANDT

..................................................................  (Seal)
-Borrower

..................................................................  (Seal)
-Borrower

..................................................................  (Seal)
-Borrower


[Sign Original Only]


BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 6 of 6)*


CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL.

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

Bear Stearns Residential Mortgage Corp     ☐ Preliminary ☒ Final
1241 E Dyer Road, Suite 110     *DATE:* 04/24/2007
Santa Ana, CA 92705     *LOAN NO.:* 20727772
BORROWERS:JAMES A BRANDT     *Type of Loan:* Conventional
    APP NO.:20727772

ADDRESS: 25943 SANDALIA DRIVE
CITY/STATE/ZIP: SANTA CLARITA, CA    91355
PROPERTY: 25943 SANDALIA DRIVE, SANTA CLARITA, CA   91355

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.871 % | $ 737,462.38 | $ 337,426.58 | $ 1,074,888.96 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING |
|---|---|---|---|---|---|
| 12 | $1,106.44 | 06/01/2007 | | | |
| 12 | $1,189.42 | 06/01/2008 | | | |
| 12 | $1,278.63 | 05/01/2009 | | | |
| 324 | $3,185.17 | 06/01/2010 | | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE: THE CURRENT INDEX RATE IS 5.027%
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355

ASSUMPTION: Someone buying this property ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $ **See HUD1

PROPERTY INSURANCE: ☒ Property hazard insurance in the amount of $344,000.00 with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance ☐ is ☒ is not available through the lender at an estimated cost of _____ for a _____ year term.

LATE CHARGES: If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
**e means estimate**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_James A. Brandt_    4/24/07
JAMES A BRANDT    BORROWER/DATE        BORROWER/DATE

BORROWER/DATE        BORROWER/DATE

EMC-JM 00735

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

20727772                                                                                          20727772

VMP® -788 (0310)                            Page 2 of 2                            

## Bear Stearns Residential Mortgage Corporation

## ADJUSTABLE RATE LOAN PROGRAM DISCLOSURE
### (This is neither a contract nor a commitment to lend)

DATE: April 24, 2007

BORROWER: JAMES A BRANDT

LOAN NUMBER: 20727772

PROPERTY ADDRESS: 25943 SANDALIA DRIVE
SANTA CLARITA, CA  91355

ADJUSTABLE RATE LOAN PROGRAM:  BEAR SELECT ARM

This disclosure describes the features of the adjustable rate mortgage (ARM) program that you are considering. Information on other ARM programs is available upon request.

### How Your Interest Rate and Payment are Determined

- Depending upon the ARM program for which you have applied, your interest rate will be fixed for either the first month or the first three months, after which your interest rate can change every month based upon the index rate plus a margin.
- Your payment can change once each year based on the interest rate, loan balance, and loan term.
- Your interest rate will be based on the "index rate" which is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year. The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.  Ask us about our current interest rate and margin.
- Information about the index rate is published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").
- This adjustable rate loan may have a discount or premium feature, and your initial interest rate may not be based on the index used for later adjustments. Ask us for the amount of the current discount or premium.

### How Your Interest Rate Can Change

- At each change date your new interest rate will equal the new  "index rate" plus the margin rounded to the nearest one eighth of one percentage point (0 .125%) unless your interest rate "cap" or your interest rate "floor" limit the amount of the change in interest rate.
- Your interest rate "cap" and "floor" work as follows:
  - Your interest rate cannot exceed <u>9.950%</u>.
  - Your interest rate cannot decrease to less than the margin on your loan.

BSR 1041
Bear Select Arm Disclosure

**Your Monthly Payment And How It Can Change**

- Unless limited as set forth below, each month you will have the option of paying one of the following monthly payments:
  - A minimum payment calculated using the initial interest rate
  - An interest only payment
  - A fully amortizing payment based on a 15-year term to maturity
  - A fully amortizing payment based on the actual remaining term to maturity.
- Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.
- Your monthly payment can change once each year based on the Index rate and the margin.
- At each annual payment change date, your new minimum payment amount will be capped at an amount 7.5% more than your prior minimum payment amount.
- If your monthly payment is not sufficient to pay all interest due, any accrued and unpaid interest will be added to the loan principal and will accrue interest at the note rate. **This means the balance due on your loan could increase. This feature is called Negative Amortization.**
- Your loan principal can never be more than 115% of your original loan amount (110% if the property is located in New York). If your loan ever reaches that point, your monthly payment will be adjusted to a fully amortizing payment until the next scheduled adjustment date.
- Beginning on the fifth annual payment change date and on each fifth annual anniversary thereafter, your monthly payment will be changed to a fully amortizing payment based on the actual remaining term to maturity. You will continue to make this fully amortizing payment until the next scheduled payment adjustment date.
- You will be notified in writing at least 25 days before a payment adjustment is effective. The notice will contain information about your interest rate, payment amount and loan balance.

**Example for a loan in which the initial interest rate is fixed for one month:**

- On a new $10,000, 30-year loan with an initial interest rate of 1.25% based upon an index in effect as of the first working day of June, 2005, with a discounted rate, the maximum that the interest can rise under this program is 8.95 percentage points (8.95 %) to 9.95% in the 6th year and the payment could increase from a beginning payment of $33.33 to a maximum payment of $101.70 in the 3rd year. To see what your principal and interest payments would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. For example, the monthly payment on a mortgage amount of $60,000 would be: $60,000÷$10,000 = 6.0 x $33.33 = $199.98 per month.

**Example for a loan in which the initial interest rate is fixed for three months:**

- On a new $10,000, 30-year loan with an initial interest rate of 1.75% based upon an index in effect as of the first working day of June, 2005, with a discounted rate, the maximum that the interest can rise under this program is 8.95 percentage points (8.95%) to 9.95% in the 6th year and the payment could increase from a beginning payment of $35.72 to a maximum payment of $102.14 in the 3rd year. To see what your principal and interest payments would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. For example, the monthly payment on a mortgage amount of $60,000 would be: $60,000÷$10,000 = 6.0 x $35.72 = $214.32 per month.

I/We hereby acknowledge receipt of this Adjustable Rate Loan Program Disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.

BSR 1041
Bear Select Arm Disclosure

EMC-JM 00669

Borrower   JAMES A BRANDT _____ / __4/24/07__ / Date

Borrower _____ / _____ / Date

Borrower _____ / _____ / Date

Borrower _____ / _____ / Date

BSR 1041
Bear Select Arm Disclosure

EMC-JM 00670

Loan No.  20727772

### PREPAYMENT NOTE ADDENDUM
### (Multi-State)

This Prepayment Note Addendum is made this 24th day of April, 2007 and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to Bear Stearns Residential Mortgage Corporation (the "Lender") which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at

25943 SANDALIA DRIVE
SANTA CLARITA, CA  91355
(the "Property")

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note, any addenda to the Note or the Security Instrument, Borrower and Lender covenant, and agree, that the provisions of the section of the Note entitled **"BORROWER'S RIGHT TO PREPAY"** or **"BORROWER'S PAYMENTS BEFORE THEY ARE DUE"** are amended to read as follows:

Subject to the prepayment penalty provided below, I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid principal due under this Note. A payment of only part of the unpaid principal is known as a "partial prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

If within the 36 - month period beginning with the date I execute this Note (the "Penalty Period"), I make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, I will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of (a) the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of this Note, calculated at the rate of interest in effect under the terms of this Note at the time of the prepayment; or (b) the maximum allowable prepayment penalty permitted by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

The Note Holder will apply all prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of this Note. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If this Note is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase. If this Note is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

BSR 1023 Prepay Addendum-Hard

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge. Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

NOTE TO BORROWER

Do not sign this Addendum before you read it. This Addendum provides for the payment of a prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of the Addendum.

_____ (Seal)   _____ (Seal)
JAMES A BRANDT                    Borrower                            Borrower

_____ (Seal)   _____ (Seal)
             Borrower                            Borrower

_____ (Seal)   _____ (Seal)
             Borrower                            Borrower

_____ (Seal)   _____ (Seal)
             Borrower                            Borrower

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

BSR 1023 Prepay Addendum-Hard

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge A. Howard Matz and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV09- 5438 AHM (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

KABATECK BROWN KELLNER LLP
Brian S. Kabateck (SBN 152054)
Richard L. Kellner (SBN 171416)
644 South Figueroa St.
Los Angeles, CA 90017
Tel. (213) 217-5000

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH A. MONACO, ANITA M. MONACO, and JAMES BRANDT, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>THE BEAR STEARNS Companies Inc; Bear STEARNS RESIDENTIAL mortgage Corporation Bear Stearns & CO.; EMC MORTGAGE Corporation JP Morgan Chase + Co and Does 1-10 inclusive DEFENDANT(S). | CASE NUMBER<br><br>CV09-05438 AHM (RCx)<br><br><br>SUMMONS |

TO:   DEFENDANT(S): <u>The Bear Stearns Companies, Inc.; Bear Stearns Residential Mortgage Corp.; Bear</u>
<u>Stearns & Co.; EMC Mortgage Corp.; JP Morgan Chase & Co.</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Kabateck Brown Kellner LLP</u>, whose address is <u>644 South Figueroa Street, Los Angeles, CA  90017</u>.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

LA'REE HORN

Dated: ___JUL 2 4 2009___     By: _____

Deputy Clerk

(Seal of the Court)

1192

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                              SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
JOSEPH A. MONACO, ANITA M. MONACO, and JAMES BRANDT, individually and on behalf of all others similarly situated

**DEFENDANTS**
THE BEAR STEARNS COMPANIES, INC.; BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION; BEAR STEARNS & CO.; EMC MORTGAGE CORPORATION; JP MORGAN CHASE & CO.; and DOES 1 through 10

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Kabateck Brown Kellner LLP
644 South Figueroa St.
Los Angeles, CA  90017 (213) 217-5000

Attorneys (If Known)
unknown

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of The Truth in Lending Act, 15 U.S.C. Sec. 1601, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☑ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: 2:07-cv-05607-SJO-CT (C.D. Cal.)

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)

CIVIL COVER SHEET

Page 1 of 2

CV09-05438

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☑ Yes
If yes, list case number(s): 2:07-cv-05607-SJO-CT (C.D. Cal.)

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 2:07-cv-05607-SJO-CT (C.D. Cal.)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): *J. Melidonian /s Brian S.* Date July 24, 2009
*Kabateck*

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |