FILED

2011 FEB -3  PM 3: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY

**SPIRO MOSS LLP**
J. Mark Moore (SBN 180473)
mark@spiromoss.com
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Tel.: (310) 235-2468
Fax: (310) 235-2456

**WILLIAMS CUKER & BEREZOFSKY**
Mark R. Cuker (*Admitted Pro Hac Vice*)
mcuker@wcblegal.com
Michael J. Quirk (*Admitted Pro Hac Vice*)
Mquirk@wcblegal.com
1515 Market Street, Suite 1300
Philadelphia, PA 19103-1819
Tel.: (215) 557-0099
Fax: (215) 557-0673

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
6303 Owensmouth Ave., 10th Floor
Woodland Hills, CA 91367-2263
Tel.: (818) 961-2000
Fax: (818) 936-0232

[*Additional counsel listed on signature page*]
Attorneys for Plaintiffs and the putative Class.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JOSEPH A. MONACO, ANITA M.
MONACO, and JAMES BRANDT,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

BEAR STEARNS RESIDENTIAL
MORTGAGE CORPORATION; BEAR
STEARNS & CO.; EMC MORTGAGE
CORPORATION, JPMORGAN CHASE
& CO. and DOES 1 through 200,
inclusive,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:09-cv-05438-SJO (JCx)

**SECOND AMENDED CLASS ACTION
COMPLAINT FOR:**

**(1)  Violations of the Truth in Lending
Act, 15 U.S.C. §1601, *et seq*;**

**(2)  Fraudulent Omissions;**

**(3)  Violation of Bus. & Prof. Code
§17200, *et seq*. – "Unlawful,"
"Unfair" and "Fraudulent" Business
Practices;**

**(4)  Breach of Contract; and**

**(5)  Tortious Breach of the Covenant of
Good Faith and Fair Dealing.**

**JURY TRIAL DEMANDED**

COPY

1    Plaintiffs, JOSEPH A. MONACO, ANITA M. MONACO, and JAMES BRANDT

2    ("Plaintiffs"), individually and on behalf of all others similarly situated allege as follows:

3

4    # I.

5    ## INTRODUCTION

6    1.    This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C.

7    §§1601, *et seq.*, California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§

8    17200, *et seq.*, and other statutory and common law.  Plaintiffs, individually and on

9    behalf of all others similarly situated ("Class Members") bring this action against

10   Defendants BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION; BEAR

11   STEARNS & CO.; EMC MORTGAGE CORPORATION; JPMORGAN CHASE & CO.,

12   and DOES 1-200 (collectively, "Defendants"), based upon Defendants' failure to clearly,

13   unambiguously and conspicuously disclose to Plaintiffs and the Class Members, in

14   Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in

15   the accompanying required disclosure statements:  (i) the actual interest rate on the Notes

16   (12 C.F.R. § 226.17); (ii) that the initial interest rate disclosed in the Notes would last

17   only one month, was discounted, and was substantially lower than the actual interest rate

18   that Plaintiffs and Class Members would be actually charged on the Notes; (iii) that the

19   amount of monthly payments provided for in the Notes and for the first 3-5 years in the

20   Truth in Lending Disclosure Statement ("TILDS") was based  entirely on the "teaser"

21   rate; and (iv) that the amount of the monthly payments after one month would not be

22   sufficient to even pay the interest being charged, let alone amortize the loan, so that each

23   month the principal balance would increase even if the payments were made as scheduled

24   (12 C.F.R. § 226.19).  (Hereinafter, (i) through (iv) shall be referred to as "The Material

25   Omissions").

26   2.    On August 28, 2007, Plaintiffs filed their original complaint, *Monaco, et al.

27   v. Bear Stearns, et al.*, No 2:07-cv-05607-SJO-CT (C.D. Cal.) ("Monaco I").  Pursuant to

28   a stipulation and tolling agreement, on February 5, 2009, the Honorable James S. Otero

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

granted Plaintiffs' unopposed request to dismiss Monaco I, without prejudice.  The stipulation and tolling agreement tolled any claims asserted by plaintiffs, or that could have been asserted by plaintiffs, for purposes of the statute of limitations from August 28, 2007 through July 29, 2009.  *See* Monaco I, Dkt. No. 70.

## II.

## **THE PARTIES**

3.    Plaintiffs JOSEPH A. MONACO and ANITA M. MONACO are, and at all times relevant to this Complaint were, individuals residing in Palmdale, California.  On or about April 10, 2006, Mr. and Mrs. Monaco refinanced their existing home loan and entered into an Option ARM loan agreement with Defendant BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION.  Mr. and Mrs Monaco subsequently made contractual payments as scheduled thereunder.  The Option ARM loan was secured by Mr. and Mrs. Monaco' residence.  Attached hereto as Exhibit 1 are true and correct copies of the Note, Truth and Lending Disclosure Statement ("TILDS"), and Program Disclosure (collectively the "Loan Documents"), pertinent to this action.

4.    Plaintiff JAMES BRANDT is, and at all times relevant to this Complaint was, an individual residing in Santa Clarita, California.  On or about April 24, 2007, Mr. Brandt refinanced his existing home loan and entered into an Option ARM loan agreement with BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION.  Mr. Brandt subsequently made contractual payments as scheduled thereunder.  The Option ARM loan was secured by Mr. Brandt's primary residence.  Attached hereto as Exhibit 2 are true and correct copies of the Loan Documents pertinent to this action.

5.    Defendant  BEAR STEARNS RESIDENTIAL MORTGAGE CORPORATION ("BSRMC") is, and at all relevant times was, qualified to do business in California, and business in this judicial district.  BSRMC is a corporate affiliate of EMC Mortgage Corporation, both of which were, at all times material hereto, wholly owned subsidiaries of The Bear Stearns Corporation ("TBSC").  Defendant BSRMC is a

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

California corporation licensed to do business and doing business in California.  At all
relevant times hereto BSRMC was and is engaged in the business of originating,
distributing and selling the Option ARM loans that are the subject of this Complaint.
BSRMC transacts business in Los Angeles County, California and at all relevant times
originated, distributed, and sold Option ARM loans throughout the United States,
including Los Angeles County, California.  BSRMC has significant contacts with Los
Angeles County, California, and the activities complained of herein occurred, in whole or
in part, in this District.

6.     Defendant BEAR STEARNS & CO. ("BS&C" or "BEAR STEARNS") is a
wholly owned subsidiary of TBSC and is, and at all material times relevant to this
Complaint was, qualified to do business in California and doing business in this judicial
district.  Plaintiffs are informed, believe, and thereon allege that Defendant BEAR
STEARNS & CO. purchased, securitized, bonded and/or acted as an underwriter in the
securitization of some or all of the Option ARM loans that are the subject of this
Complaint.

7.     Defendant EMC MORTGAGE CORPORATION ("EMC MORTGAGE" or
"EMC") is a Delaware Corporation, headquartered at 2780 Lake Vista Drive, Lewisville,
TX, 75067-3884, and is a wholly owned subsidiary of TBSC.  Plaintiffs are informed,
believe, and thereon allege that EMC MORTGAGE purchased, securitized, bonded or
otherwise is and was an assignee of most or all of the Option ARM loans that are the
subject of this Complaint.

8.     At all times relevant, EMC,  BSRMC and BS&C, acting in concert, created,
approved, sold, controlled and/or dictated the terms of the Option ARM loans that are the
subject of this complaint.

9.     On April 10, 2006, BSRMC sold and/or assigned Plaintiffs Mr. and Mrs.
Monaco's Option ARM loan that is the subject of this action, together with all rights and
liabilities associated therewith, to EMC MORTGAGE.  On April 24, 2007, BSRMC sold
and/or assigned Plaintiffs Mr. Brandt's Option ARM loan that is the subject of this

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

action, together with all rights and liabilities associated therewith, to EMC MORTGAGE.

10.    Plaintiffs are informed, believe, and thereon allege that defendants EMC MORTGAGE, BS&C and DOES 1-200 were and are engaged in the business of purchasing, packaging, designing, and securitizing some of the Option ARM loans that are the subject of this Complaint, including Plaintiffs' Option ARM loans.  Plaintiffs are further informed, believe, and thereon allege that:

(a)    EMC MORTGAGE is, and/or was, in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles so that it could sell bonds to investors based on the income to be derived from those loans.  EMC MORTGAGE is a critical and necessary participant in that securitization process.

(b)    EMC MORTGAGE agreed to purchase and did purchase numerous Option ARM mortgages originated by BSRMC and others.  This agreement was in place before any of the subject Option ARM loans in question were sold, closed or otherwise consummated.

(c)    Without EMC MORTGAGE's agreement to purchase the Option ARM loans originated by BSRMC  and others, BSRMC and other originators could not have sold, closed or otherwise consummated the subject Option ARM loans.   This is because BSRMC and most originators, including Does 1-200, lacked the financial resources to fund and consummate the subject ARM loans at issue unless could immediately sell them to packagers such as EMC MORTGAGE.

(d)    By committing to purchase those originators' loans, EMC made it possible for those originators to draw upon their warehouse lending facilities and other lines of credit in order to fund the loans at issue here.  In the absence of EMC's purchase commitments, those originators would have been unable to draw upon the warehouse lines

1    of credit and other credit facilities to fund loans.

2        11.    While providing that stream of financing to BSRMC and other originators,

3    defendants EMC MORTGAGE and DOES 1-200 were aware of The Material Omissions.

4        12.    Defendant JPMORGAN CHASE & CO. ("JPMORGAN CHASE") is, and at

5    all relevant times was qualified to do business in California, doing business in this

6    judicial district.  On or about May 30, 2008, JPMORGAN CHASE acquired BEAR

7    STEARNS and its subsidiaries in a merger for approximately $1.5 billion in stock.

8    JPMORGAN CHASE is the successor in interest to the Bear Stearns entities, including

9    BSRMC and BS&C.  In particular, JP MORGAN CHASE has admitted to being the legal

10   successor in interest to BSRMC in other federal court actions, including *Byron v. EMC*

11   *Mortgage Corp et al.*, No. 9 CV 197 E.D. VA, where Carl Del Vecchio, Assistant Vice

12   President of JP MORGAN CHASE affirmed that JP MORGAN CHASE is "the successor

13   in interest to" BSRMC.  A copy of this document is attached hereto as <u>Exhibit 3</u>.

14   JPMORGAN CHASE is also subject to Plaintiffs' and Class Members' claims asserted

15   herein pursuant to California Civil Code §1459 and California Code of Civil Procedure

16   §368 by virtue of its acceptance of the assignment of the loans at issue herein, which are

17   non-negotiable instruments.  JPMORGAN CHASE is therefore liable for the acts and

18   omissions alleged herein.  JPMORGAN CHASE transacts and has transacted significant

19   business in California and in Los Angeles County, California by purchasing, designing,

20   distributing, selling and/or servicing Option ARM loans to Plaintiff and Class Members.

21       13.    Plaintiffs are informed, believe, and thereon allege that DOES 1 through

22   200, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO),

23   CDO underwriters, CDO trustees, hedge funds, mortgage brokers or other entities that

24   acted as loan originators, additional lenders and/or securitizers , and/or are assignees to

25   the loans which are the subject of this action.  Plaintiffs will seek leave of Court to

26   replace the fictitious names of these entities with their true names when they are

27   discovered.

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

14.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants DOES 1 through 200, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said defendants by such fictitious names.  Plaintiffs allege, on information and belief, that each DOE defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of Court to amend this Complaint when the names of said DOE defendants have been ascertained.

**THE BEAR STEARNS SECURITIZATION MACHINE**

15.     At all times mentioned herein, Defendants were engaged in the business of originating, selling, securitizing, servicing, and/or owning, and/or are or were the assignees of, the Option ARM loans that are the subject of this Complaint, throughout the United States, including in Los Angeles County, California.

16.     At the time the transactions at issue in this litigation were consummated, BEAR STEARNS had long been a leader in all facets of mortgage-loan securitization, and was at or near the top of the charts for issuance and underwriting of mortgage-backed securities for 17 years running.[1]  Through its network of affiliates, BEAR STEARNS controlled every step in the mortgage-loan-securitization chain: from the origination and servicing of loans that provided the cash flow for the mortgage-backed securities; to the "warehouse" or temporary financing of large pools of "whole loans" pending their pooling and securitization into mortgage backed securities; to the underwriting and distribution of the mortgage-backed securities that provided permanent financing to EMC with respect to the mortgage loans; to the management of hedge funds that it caused to buy the mortgage-backed securities it and its affiliates originated.

---

[1]  *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006, *available at:* http://www.abalert.com/Public/MarketPlace/Ranking/index.cfm?files=disp&article_id=1044674725 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market")

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

17.    EMC played a crucial role within the BEAR STEARNS securitization machine.  According to SEC filings, BEAR STEARNS established EMC in 1990 as its mortgage-backing arm to facilitate the purchasing and servicing of mortgage loans as a complement to BEAR STEARNS' own loan originations.  EMC contributed greatly to BEAR STEARNS' rise to the very top of the mortgage-finance industry by purchasing over $200 billion in residential whole loans and servicing rights.  BEAR STEARNS, through BSRMC, EMC and other subsidiaries, thus acted both as an "originator" and an "aggregator" of an enormous volume of residential mortgage loans, with the ultimate strategy of securitizing them into an array of Bear Stearns' securitizations.  EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it acquired and securitized.  In its role as aggregator, EMC prescribed loan origination standards and approved the underwriting guidelines of its vast network of loan originators, and whose loan origination activities it thus helped finance.

18.    BEAR STEARNS reported in 2006 that "Our vertically integrated franchise allows us to access every step of the mortgage process, including originating, securitization, distribution and servicing", and that it was first in the U.S. mortgage-backed security underwriting and securitization of adjustable rate mortgages.

19.    The product of this machine was a successful and extraordinarily profitable enterprise. Bear Stearns recorded gains and earned fees at every step in this chain: (i) loan-origination fees, (ii) servicing fees, (iii) gains on sale of the mortgages to the securitization trusts, (iv) fees from underwriting mortgage-backed securities, (v) gains and fees from CDOs into which these securities were repackaged, (vi) gains and fees from trading in these securities and interests in the CDOs into which they were placed, and (vii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by Bear Stearns that ultimately were backed by residential mortgage loans.

20.    From 2003 to 2006, Bear Stearns' revenue and profit increased by 123.8% and 77.6%, respectively, driven in large part by mortgage finance and its securitization

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

machine.[2]  The volume of EMC's securitizations also grew markedly over the same period.  According to SEC filings, in 2003, EMC securitized 86,000 loans valued at approximately $20 billion.  That number nearly tripled in 2004 to 230,000 loans, valued at $48 billion.  In 2005, the number jumped to 389,000 loans, valued at nearly $75 billion.  And in 2006, EMC securitized over 345,000 loans valued at $69 billion.  Thus, from 2003 to 2007, EMC purchased and securitized more than one-million mortgage loans originally valued in excess of $212 billion.  For 2006, Bear Stearns' overall securitization volume rose to $113 billion from $95 billion in fiscal 2005, amounting to 11% of the overall U.S. mortgage-backed securities market.[3]

21.    The securitization process began with Bear Stearns directing EMC to acquire certain mortgages, which a Bear Stearns entity then purchased from EMC.  In the next step, a Bear Stearns entity, in its role as Depositor, transferred the ownership of the bundle of mortgages to a Trust.  This initial conveyance of the legal ownership of the subject mortgages also includes the transfer of the Notes underlying the mortgages, since it is the Note that obligates the borrower to make payments..  The trustee of the Trust is typically a third party financial institution such as Wells Fargo or J.P. Morgan.  In return, BEAR STEARNS receives Certificates back from the Trustee, which BEAR STEARNS in turn sells to investors, holds for its own benefit or passes back to EMC.  Taken as a whole, these Certificates represent the entire beneficial ownership interest in the mortgage assets contained in the Trust.  Individually, however, each Certificate varies in the rights of ownership and repayment granted to the holder.  Some Certificates grant only the right to receive certain income from the Trust while other certificates grant ownership in the residual assets of the Trust.  The composition of the Certificates and the respective rights granted to each Certificate are governed by a Pooling and Servicing Agreement.

---

[2]    Bear Stearns Companies Inc., Annual Report (Form 10-K), at 70 (Nov. 30, 2006); Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).
[3]    Q4 2006 Bear Stearns Earnings Conference Call, Dec. 14, 2007.

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

22.    In most BEAR STEARNS offerings, EMC acts as Master Servicer or at least provides the actual servicing of the securitized mortgage loans even when a different entity is acting as Master Servicer.

23.    Critical to BEAR STEARNS' perpetuation of this successful enterprise was an increasing supply of mortgage loans.  As investor demand for mortgage-backed securities created and sold by BEAR STEARNS grew, so did the need for an ever-increasing numbers of loans to securitize.  BEAR STEARNS founded BSRMC in 2005 to increase originations of mortgages to feed its securitization machine.  Mary Haggerty, head of loan acquisitions for BEAR STEARNS' mortgage financing department, and Thomas Marano, head of mortgages for BEAR STEARNS, were both original incorporators of BSRMC.  BSRMC began the wholesale origination of mortgages on April 1, 2005.  On the very same day, BSRMC entered into an agreement to sell the mortgages it originated to EMC.

24.    BEAR STEARNS, through another affiliate, EMC Residential, frequently provided lenders warehouse lines of credit to generate, to EMC's specifications, the ever-increasing volume of loans for EMC to purchase and securitize.

25.    With a corporate objective of increasing origination and securitization volume, BEAR STEARNS, EMC, and BSRMC worked together to develop the Option ARM loan as a mass market product because it offered the lowest monthly payment, albeit a deceptively low payment because it did not reflect the full amount of the interest being charged.

26.    BEAR STEARNS was quoted in a July 14, 2005 Reuters report as stating "no other product can compete with the low monthly payment of an Option ARM." In discussing Option ARM loans, Thomas F. Marano, global head of mortgage and asset backed securities at BEAR STEARNS told Business Week "at a price, you can originate or sell anything."  (9/11/2006)

27.    Even though OPTION ARM borrowers were not paying all the interest, Defendants booked the "deferred interest" as income, thereby fattening up their bottom

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1  lines and bonus pools.

2      28.   In its 2008 Annual Report to its shareholders, JP MORGAN CHASE

3  described Option ARM loans as "possibly the worst mortgage product."  JP MORGAN

4  CHASE had refrained from writing these loans because "we did not think they were a

5  consumer friendly product."

6      29.   Pursuant to California Civil Code § 1459 and California Code of Civil

7  Procedure § 368, defendants BEAR STEARNS and EMC MORTGAGE (and defendant

8  JPMORGAN CHASE by virtue of its merger with BEAR STEARNS and as BEAR

9  STEARNS' successor-in-interest) are subsequent purchasers and/or assignees of

10 Plaintiffs' and the Class Members' Option ARM loans.  At all times relevant, Defendants

11 are and/or were sophisticated and knowledgeable entities whose businesses included

12 designing, originating, purchasing, packaging, securitizing and selling interests in the

13 subject Option ARM loans.  The subject Option ARM loans at issue are non-negotiable

14 instruments within the meaning of Civil Code § 1459 and at all times relevant,

15 Defendants purchased, packaged, securitized and/or sold the subject Option ARM loans

16 with full knowledge of the failures to disclose and The Material Omissions as alleged

17 herein.  Defendants therefore "stand in the shoes" of the assignors and originators of

18 those mortgages, taking their rights and remedies, subject to any defenses that the obligor

19 (Plaintiffs and Class Members) has against the assignor prior to notice of the assignment.

20 15 U.S.C. § 1641 provides that assignees are liable for violations that are apparent on the

21 face of disclosure documents and other assigned loan documents.

22

23                                III.

24                   **JURISDICTION AND VENUE**

25     30.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1601 *et*

26 *seq.* and 28 U.S.C. §§ 1331 and 1367(a).

27     31.   The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §

28 1332(d)(2), the "Class Action Fairness Act," as the amount in controversy exceeds

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1  $5,000,000.00 and many Class Members are citizens of different states than Defendants.

2      32.    This Court has personal jurisdiction over the parties in this action, because

3  Defendants are corporations or other businesses duly licensed to do business in

4  California.

5      33.    Venue is proper within this District and Division pursuant to 28 U.S.C.

6  §1391(b), because a substantial part of the events and omissions giving rise to the claims

7  occurred in this District, and because there is personal jurisdiction in this District over the

8  named Defendants because they regularly conduct business in this judicial district.

9

10                                    **IV.**

11                    **FACTS COMMON TO ALL CAUSES OF ACTION**

12     34.    Defendants, and each of them, created, designed, purchased, sold,

13  distributed, serviced, owned and/or are assignees of the Option ARM loans that are the

14  subject of this Complaint.

15     35.    At all times relevant, EMC, BSRMC and BEAR STEARNS jointly

16  perpetrated the fraudulent scheme alleged herein to originate, acquire and securitize

17  Option ARM mortgages while failing to disclose material information to the borrowers

18  before they entered into the subject Option ARM loans.

19     36.    The Option ARM loans that are the subject of this Complaint are the loans

20  created, designed, originated and/or acquired and securitized by Defendants with the

21  following common characteristics: (i) the Monthly Payment Amount stated in the Note is

22  based upon a low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment

23  schedule listed in the TILDS, for the first 3-5 years of the Note, is based upon a fully

24  amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only

25  one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the

26  first 3-5 years of the loans, the amount of the monthly payments increases to a fully

27  amortizing payment based upon the remaining principal balance at that time.

28  / / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

37.    Defendants knew that for Plaintiffs' and Class Members' loans, the sum of the index and the margin would necessarily result in an interest rate that always exceeded the "teaser" rate by several percentage points.  As a result, after only one month, the interest accruing on the note more than doubled from an amount which was usually below 2% to an amount of at least 6%, and in some cases up to 8%.  Because of this dramatic interest rate adjustment after only one month, the monthly payment, which was calculated based on a fully amortizing payment at the low teaser rate, was no longer sufficient to even pay the interest which accrued on the note, and the balance owed increased even if the payments were made as scheduled on the Note and the TILDS.  This process is known as negative amortization, and Defendants knew it was *certain to occur* because of the large spread between the teaser rate and the combined index and margin.  Indeed the margin alone was consistently higher than the "teaser" rate.  Thus, even if the index went down to zero – which was impossible during the time frame when these loans were written – the combined total of the margin and index would never be close to the "teaser" rate, and thus the Option ARM loans at issue would always, and were designed to, cause negative amortization.  In reality, the fully indexed rate was at least 7.375% for the named plaintiffs, so that the amount necessary to pay even the interest due each month was almost double the amount specified in the note, and the amount needed to actually pay the loan off over 30 years was even more than that.  Defendants designed the loan program to withhold this critical information from the borrowers until at least a month after the loan closed, when the borrower would receive a bill which, for the first time, informed her of the actual cost of the loan. By that time, the borrower was locked into the loan by a prohibitive three-year prepayment penalty.  Defendants never disclosed to Plaintiffs and Class Members this material information.  Plaintiffs relied on the interest rate and monthly payments specified in the Note and TILDS to be fully amortizing, and believed that making the payments specified in these loan documents would reduce their loan balances, not increase them.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have entered into the subject Option ARM loans.

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

38.     Because of the way Defendants structured the Option ARM loans at issue, it was certain that, as the scheduled payments were made each month, each Class Member would owe more money than he or she did at the start of the loan, and have less time to pay it back.  Indeed, every time Plaintiffs and Class Members made a payment in the amount reflected in the TILDS, the principal balance on their loans increased.  To make matters worse, this "deferred interest" was added to the principal balance and, in turn accrued more interest – in effect using compound interest to increase the balance owed by each borrower.

39.     Although Defendants knew that negative amortization was certain to occur, they never disclosed this to Plaintiffs or Class Members, who refinanced their homes and entered into these loans without ever receiving this material information.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have entered into the subject Option ARM loans.

40.     The two most important pieces of information in any mortgage loan are the interest rate and the amount of the monthly payments.  For the Defendants' Option ARM loans, the disclosures of both pieces of this information were misleading and omitted material facts.  The Loan Documents disclosed a teaser interest rate, but they did not disclose that this rate would sharply increase after only one month.  The Loan Documents disclosed a low monthly payment for the first 3-5 years of the loan, which was based on the teaser rate, but this did not reflect the actual amount of interest being charged or the amount Plaintiffs and Class Members actually owed each month.

41.     On the contrary, the Loan Documents contained statements that were designed to conceal, and did conceal, that the interest rate would increase sharply after just one month.  Thus, the Loan Documents stated:  "THIS NOTE PROVIDES FOR A CHANGE IN MY *FIXED INTEREST RATE* TO AN ADJUSTABLE INTEREST RATE.  THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AMOUNT I MUST PAY."  The statement that the loan featured a fixed interest rate was false.  At no time

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1  was the interest rate on the loan a fixed rate, as the interest rate could change every

2  month, and was guaranteed to increase sharply after the first month.  Moreover, the

3  statement that the Note restricted the amount by which the adjustable rate could change

4  reinforced the notion that the payment schedule included in the Loan Documents tracked

5  the interest rate that would actually apply to the loan (because those payments increased

6  slightly each year until year 5, when there was a more substantial increase in the

7  disclosed payment) and concealed the fact that the disclosed payment schedule did not

8  reflect borrowers' actual legal obligations under the loan terms.

9       42.    Plaintiffs and Class Members were not informed of the sharp increase in the

10  interest rate, and the fact that their monthly payments were not enough to pay the interest

11  accruing on the loan, until they had made multiple payments following the closing of the

12  loan, at which time they would receive a statement showing that the principal balance had

13  increased with each month that had passed since the loan closed, despite the fact that the

14  borrower had made all payments as scheduled.  Had Defendants disclosed this material

15  information, Plaintiffs and Class Members would not have entered into the subject

16  Option ARM loans.

17       43.    By the time this material information was disclosed to Plaintiffs and Class

18  Members, they were "locked" into the loan by a draconian prepayment penalty consisting

19  of a prepayment charge equal to the amount of interest that would accrue during a

20  six-month period on the amount prepaid (if the prepayment amount was greater than 20%

21  of the original principal amount stated in the Note), which is to be calculated at the rate of

22  interest in effect under the terms of the Note at the time of the prepayment for a

23  prepayment occurring during the first two to three years of the loan.  This draconian

24  provision was designed by Defendants to deter and prevent anyone from refinancing the

25  loan during the applicable time period.

26       44.    Before Plaintiffs and Class Members entered into the subject Option ARM

27  loans, Defendants failed to disclose and concealed the amount by which the borrowers'

28  loan balances would increase over the first three to five years of the loan, even though

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1    Defendants had actually performed this calculation internally and thus knew the truth.

2    This increase in the loan balance is material information to any consumer entering into

3    these loans, because it effectively strips the homeowners of equity in their homes, and

4    greatly impairs their ability to refinance these loans once they recast to substantially

5    higher monthly payments.  Thus, the loans were structured so that once borrowers were

6    given or discovered the material information, that their loans were negatively amortizing,

7    Plaintiffs and Class Members could only get out of the loans if they incurred a substantial

8    prepayment penalty, or waited two to three years, in which case they would have to

9    refinance a substantially larger principal amount.  Had Defendants disclosed this material

10   information, Plaintiffs and Class Members would not have entered into  the subject

11   Option ARM loans.

12          45.     Each subject Option ARM loan has a so-called payment cap, which provides

13   that, even when the monthly payment could increase, it would not increase by more than

14   7.5% per year.  This payment cap is, however, subject to an overall cap on principal of

15   115% of the original loan amount.  Once the loan principal reaches this 115% cap, the

16   7.5% limitation on payment increases no longer applies, and the payment generally will

17   increase by more than that amount.  This built-in "payment shock" is more than many

18   Class Members can afford and was substantially certain to put them at risk of losing their

19   homes to foreclosure.

20          46.     However, the most that Defendants' Loan Documents said about negative

21   amortization was that it "may" occur.  This was ambiguous, misleading and deceptive,

22   because it implies that negative amortization was subject to some future contingency,

23   such as an increase in the index on which the adjustable rate was purportedly based,

24   when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed

25   the same or went down.

26          47.     The undisclosed fact that negative amortization is certain to occur on the

27   subject loans and information regarding the interest rate to be charged on the loan was

28   information that Plaintiffs and Class Members would have found material when deciding

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

whether to enter into the subject Option ARM loans.  Nevertheless, Defendants never disclosed to Plaintiffs and Class Members this material information.  Had Defendants disclosed this material information, Plaintiffs and Class Members would not have entered into the subject Option ARM loans.

48.    The loan characteristics described above were true of the named Plaintiffs' loans and were also common characteristics of the loan forms used by Defendant BSRMC and others during the liability period.  It is these loan forms (The Loan Documents) that are the subject of this Complaint.

49.    The failure of Defendants to disclose this material information in the Loan Documents violated TILA, state consumer protection statutes, and common law, as more fully set forth below.

**Defendants BSRMC,  EMC MORTGAGE and BS&C's Participation In The Wrongful Conduct**

50.    BSRMC, EMC and BS&C jointly agreed and jointly perpetrated the alleged fraudulent scheme to originate, acquire and securitize Option ARM loans with the full knowledge and intent that these loans would be closed without proper disclosures to borrowers before they entered into the subject Option ARM loans.

51.    BSRMC, EMC and BS&C agreed that BSRMC would originate loans which contained all of the characteristics set forth in paragraphs 36-46 above; they also agreed that BSRMC should not provide borrowers with any of the disclosures required to inform the borrowers of the actual risks posed by those loans; they further agreed that EMC would purchase these loans from BSRMC, and that BS&C would underwrite the securitization of these loans.

52.    EMC's criteria for Option ARM loans it would purchase was  incorporated into each and every purchase agreement EMC entered into with a mortgage originator. EMC required that the Option ARM loan meet the criteria set forth in paragraphs 36-46 above in order to qualify for purchase by EMC.

/ / /

53.     EMC's uniform calling scripts to borrowers whose loans had already closed, recognized that disclosures about 1) the actual amount needed to avoid negative amortization (the "interest only payment") and 2) the amount needed to pay the loan off over 30 years (the "fully amortizing payment") was "important information" necessary for the borrower to understand the financial consequences of their payments on their loan balances. Yet, EMC, BSRMC and BS&C agreed that  this information would be deliberately withheld from borrowers until at least one month after the loan closed.

54.     Because of the interrelated functions of the three companies in the origination, acquisition and securitization of Option ARM mortgages, EMC, BSRMC and BS&C acted in concert or participation with each other, and/or aided and abetted the one another, and/or were joint participants and collaborators in the acts complained of, and /or were the agents or employees of one another in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.  Each Defendant was the co-conspirator, aider and abettor, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

55.     At all relevant times, the Option ARM loans sold to Plaintiffs and many Class Members, and the documents provided them in conjunction with those loans, were devised and designed cooperatively by BSRMC, BS&C and EMC MORTGAGE as follows:

a.     BS&C,  BSRMC, and EMC MORTGAGE are in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles in order to sell securities to investors based on the income to be derived from those loans.

b.     In order to increase the number of loans they could securitize, BS&C, EMC MORTGAGE and others devised a plan to have third party

18

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1    originators such as BSRMC originate loans on their behalf.

2    c.    At the same time, BSRMC  and others needed an outlet through which

3    they could quickly dispose of the Option ARM loans they sold.

4    BSRMC and others earned income in connection with the issuance

5    and re-sale of Option ARM loans, rather than in connection with

6    servicing and holding those loans.  Because it needed to fund new

7    Option ARM loans as it issued them and because the monies available

8    to BSRMC and others for that purpose were finite and needed to be

9    regularly replenished, BSRMC and others needed assurance that it

10    would be able to promptly resell the Option ARM loans they

11    originated to other institutions like EMC MORTGAGE, BS&C, other

12    BEAR STEARNS entities and securitizers DOES.  Indeed, EMC's

13    commitment to purchase those loans allowed BSRMC to draw on its

14    warehouse line of credit, which it could not have done without those

15    purchase commitments.

16    d.    EMC MORTGAGE agreed that BSRMC would originate certain

17    Option ARM loans to homeowners.  BSRMC funded those Option

18    ARM loans and EMC MORTGAGE would then purchase the loans

19    from BSRMC and others.  Under the arrangement, BSRMC  and

20    others would collect fees from the homeowners to who took out the

21    Option ARM loans; EMC MORTGAGE would collect revenues

22    through the securitization process as "sponsor" of the mortgage-

23    backed securities  and in connection with servicing rights they

24    retained on the loans after they were securitized; BS&C and others

25    would collect fees as the underwriter of the securitization.

26    e.    According to SEC filings, EMC MORTGAGE'S underwriting

27    standards are intended to evaluate the prospective mortgagor's credit

28    standing and repayment ability, and the value and adequacy of the

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

proposed mortgaged property as collateral.  In the loan application process, EMC MORTGAGE required prospective mortgagors to provide information regarding factors such as their assets, liabilities, income, credit history, employment history and other related items. Thus, EMC MORTGAGE dictated the information that was required from loan applicants applying for Option ARM loans from BSRMC and others that EMC MORTGAGE would subsequently purchase.

f.      EMC MORTGAGE, in conjunction with BS&C, approved, and/or drafted the loan and disclosure documents, including the documents at issue in this action, with the intention that they would be used and provided to Plaintiffs and Class Members in connection with Option ARM loans that BSRMC and others originated.  EMC MORTGAGE and BS&C collectively approved the characteristics of the Option ARM loans that BSRMC and others originated to Plaintiffs and Class Members.  In addition, EMC MORTGAGE, BEAR STEARNS, and BSRMC agreed that BSRMC and other originators would use the loan and disclosure documents EMC MORTGAGE and others selected, approved, and/or provided as a condition to EMC MORTGAGE's purchase of those loans.

g.      EMC MORTGAGE made the loan and disclosure documents they drafted available to BSRMC and others through a document service company, including a company known as Doc Magic, thereby allowing BSRMC and others to insert the material facts regarding Plaintiffs and other Class Members into the EMC MORTGAGE approved loan documents, print the loan documents and provide them to Plaintiffs.

h.      The compliance of BSRMC and other originators with this process, including its use of pre-approved loan documents, was important to

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

the entire enterprise.  It was only by using the loan documents that had
been written and/or pre-approved by EMC MORTGAGE that
BSRMC and others could be assured that they  would be able to
promptly resell the Option ARM loans it issued.

      i.    BSRMC and other originators knew the contents of the loan
documents they provided to Plaintiffs and Class Members and could
have ensured that those documents disclosed all of the information
contained in The Material Omissions.  Similarly, EMC could have
required that loan documents used by BSRMC contain the material
disclosures, or else EMC would decline to purchase them. Instead of
providing Plaintiffs and Class Members with loan documents that
complied with the requirements of TILA or which contained material
information about negative amortization, they chose to provide
Plaintiffs and Class Members with the documents which omitted this
information.

56.    At all relevant times, Defendants, and each of them, actively and knowingly
participated and/or aided and abetted each other in this systematic scheme and otherwise
conspired to sell the subject Option ARM loans as alleged herein.  BSRMC, BEAR
STEARNS, EMC MORTGAGE,  BS&C and DOES 1-200 s also actively participated in
creating, designing and formulating the loan documents, disclosures and dictated the
terms of the Option ARM loans sold to Plaintiffs and Class Members.  Defendants
initiated this scheme in order to maximize the amount of the loans issued to consumers
and to maximize Defendants' profits, irrespective of the increased risks to consumers
posed by such loans.

/ / /

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

# V.

## CLASS ACTION ALLEGATIONS

57.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure, Rules 23(a) and 23(b).  The Classes that Plaintiffs seek to represent are defined as follows:

(a)    **National TILA Class**:  All individuals in the United States of America who, from August 28, 2006 through the date notice is mailed to the Class, have or had an Option ARM Loan that was sold or owned by Defendants and secured by real property on their primary residence located within the United States.  The class is defined to include only these loans which had the following characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time.  Excluded from the National TILA Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives, located in the United States of America.

(b)    **The California Class**:  All individuals who, from August 28, 2003 through the date that notice is mailed to the Class, who

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

have or had an Option ARM Loan that was sold or owned by Defendants that: (a) was secured by real property in the United States; and (b) was originated or otherwise approved by Defendants within the State of California which had the follow-ing characteristics: (i) the Monthly Payment Amount stated in the Note is based upon the low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) the interest rate "adjusts" after only one month to a rate which is the sum of the "index" and the "margin"; and (iv) after the first three to five years of the loan, the Monthly Payment Amount increases to a fully amortizing payment based upon the remaining principal balance at that time. Excluded from the National TILA Class are Defendants' employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives, located in the United States of America.

Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate sub-Classes in response to facts learned through discovery or legal arguments advanced by Defendants or otherwise

58. <u>Numerosity</u>: The Classes are so numerous that the individual joinder of all members thereof is impracticable under the circumstances of this case. While the exact number of class members is unknown at this time, Plaintiffs are informed and believe that each of the proposed Classes consists of hundreds or thousands of members.

59. <u>Commonality</u>: Common questions of law or fact are shared by Class Members. This action is suitable for class treatment, because these common questions of

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

        (a)    Whether the Loan Documents violated TILA;

        (b)    Whether the Loan Documents violated 12 C.F.R. § 226.17;

        (c)    Whether the Loan Documents violated 12 C.F.R. § 226.19;

        (d)    Whether Defendants engaged in unfair and/or fraudulent business practices that were likely to deceive Plaintiffs and Class Members before and during the loan application process;

        (e)    Whether Defendants concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under TILA, state consumer protection statutes, and/or the common law;

        (f)    Whether Defendants failed to disclose to Plaintiffs and Class Members, before they entered into the subject Option ARM loans, that negative amortization was certain to occur if the borrowers made the initial minimum monthly payments;

        (g)    Whether BEAR STEARNS, BS&C,  EMC MORTGAGE, and other subsequent purchasers and/or assignees are liable for the violations of TILA as alleged herein;

        (h)    Whether the Loan Documents are non-negotiable instruments;

        (i)    Whether Defendants' failures to disclose material information, as alleged herein, are apparent on the face of the Loan Documents;

        (j)    Whether BEAR STEARNS, BS&C, EMC MORTGAGE, and other subsequent purchasers and/or assignees are liable for the fraudulent omissions and UCL violations alleged herein;

        (k)    Whether BEAR STEARNS, BS&C, EMC MORTGAGE and others, knowingly assisted and aided and abetted BSRMC and other originators  in the  scheme to sell Option ARM loans to Plaintiffs and Class Members without disclosing the material information described

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1      herein;

2      (l)    Whether Plaintiffs and Class Members are entitled to damages;

3      (m)    Whether Plaintiffs and Class Members are entitled to punitive

4             damages; and

5      (n)    Whether Defendants' affirmative defenses, if any, raise common

6             issues of fact or law as to Plaintiffs and Class Members as a whole.

7      60.    <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of absent Class

8  Members.  Plaintiffs and the other Class Members were subjected to the same kind of

9  unlawful conduct and the claims of Plaintiffs and the other Class Members are based on

10  the same legal theories.

11      61.    <u>Adequacy</u>:  Plaintiffs are adequate representatives of each of the Classes

12  they seek to represent, because their interests do not conflict with the interests of the

13  other members of those Classes.  Plaintiffs have retained counsel competent and

14  experienced in complex class action litigation and Plaintiffs have been prosecuting this

15  action vigorously and intend to continue doing so.   The interests of Class Members will

16  be fairly and adequately protected by Plaintiffs and their counsel.

17      62.    <u>Ascertainable Class</u>:  The proposed Classes are ascertainable in that the

18  members can be identified and located using information contained in Defendants'

19  mortgage lending records.

20      63.    This case is brought and can be maintained as a class action under Rule

21  23(b)(2), and 23(b)(3):

22      (a)    <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>:

23             Defendants, and each of them, have acted or refused to act on grounds

24             generally applicable to each of the Classes, thereby making final injunctive

25             relief or corresponding declaratory relief with respect to each class as a

26             whole appropriate; and

27      (b)    <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to

28             all Class Members, including those identified above, predominate over

questions affecting only individual Class Members (if any), and a class
action is superior to other available methods for the fair and efficient
adjudication of the controversy.  Class action treatment will allow a large
number of similarly situated consumers to prosecute their common claims in
a single forum, simultaneously, efficiently, and without the unnecessary
duplication of effort and expense that numerous individual actions would
require.  Moreover, absent class treatment of this controversy, the amount of
individual Class Members' losses in comparison to the enormous cost of
litigation makes it almost certain that few Class Members would ever be able
to even seek, let alone obtain, redress for their injuries.

## VI.

### FIRST CLAIM FOR RELIEF

### Violations of TILA, 15 U.S.C. §1601, *et seq.*

### (Plaintiff Brandt and the National TILA Class Against All Defendants)

64.    Plaintiff Brandt incorporates all preceding paragraphs as though fully set
forth herein.

65.    This action was originally commenced on August 28, 2007 against
Defendants BSRMC and BS&C.  Pursuant to a stipulation and tolling agreement, on
February 5, 2009, the Honorable James S. Otero granted Plaintiffs' unopposed request to
dismiss Monaco I, without prejudice.  The stipulation and tolling agreement tolled any
claims asserted by plaintiffs, or that could have been asserted by plaintiffs, for purposes
of the statute of limitations from August 28, 2007 through July 29, 2009.  A true and
correct copy of the Joint Stipulation and Order of Dismissal is attached hereto as Exhibit
4. This action was commenced July 24, 2009, so for statute of limitations purposes, it
relates back to August 28, 2007 – slightly more than four months following the closing of
Brandt's loan on April 24, 2007. Brandt's claim is thus brought well within the one year
statute of limitations for TILA claims. 15 U.S.C. § 1640 (a).

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

66.     Defendants violated TILA through The Material Omissions by:  (1) failing to disclose that negative amortization was certain to occur; (2) establishing a payment schedule that was not based on the annual percentage rate (APR), but rather an interest rate that applied for at most only 30 days; (3) listing in the TILDS an APR having no relation to the monthly payment listed for the first three to five years; (4) failing to disclose that the initial interest rate listed in the Note was discounted; and (5) failing to disclose the certainty of negative amortization in the Loan Documents provided to Plaintiffs and Class Members before they entered into the Option ARM loans.

67.     15 U.S.C. § 1641(a) provides for assignee liability for violations that are apparent on the face of the loan documents."  The violations of TILA and Regulation Z alleged in this Complaint are apparent on the face of the loan documents.  As a result, as purchaser and assignee of Plaintiffs' and Class Members' loans, EMC MORTGAGE is responsible and answerable for the violations alleged in this claim for relief. JPMORGAN CHASE is responsible and answerable for violations of this claim for relief as successor-in-interest to BEAR STEARNS, BS&C  and BSRMC, and to the degree subject loans have been assigned or sold to it as a result of its merger with BEAR STEARNS.

**A.     Failure to Disclose That Negative Amortization Was Certain to Occur.**

68.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans, stating as follows:

> 226.19.  Certain residential mortgage and variable-rate transactions. . . .
> (b) Certain variable-rate transactions.  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . . (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover*. (Emphasis added.)

/ / /

69.     In 1995, and continuing each time new Official Staff Commentary was issued, the Federal Reserve Board ("FRB") made clear that when a loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, the disclosure requires a definitive statement about negative amortization:

> 12 CFR Part 226
> [Regulation Z; Docket No. R-0863]
> Monday, April 3, 1995
> AGENCY: Board of Governors of the Federal Reserve System.
> ACTION: Final rule; official staff interpretation.
> If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as **negative amortization will occur** and the principal balance **will increase**)… (Found at 12 C.F.R. Pt. 226, Supp. I, 19(b)(2)(vii)-2 (emphasis added).

70.     At all times relevant, statutory and common law in effect make it unlawful for lenders, such as Defendants, to fail to comply with the FRB's Official Staff Commentary, as well as Regulation Z and TILA.

71.     Defendants were aware, or should have been aware, that their Option ARM loan product had a variable rate with payment caps and that the Loan Documents were deficient because of The Material Omissions, including the failure to disclose that negative amortization was a certainty.  On information and belief, Defendants were aware of the guaranteed negative amortization, because they accrued the negative amortization as income for accounting and/or tax purposes.  Defendants were also aware that negative amortization was certain to occur, because, in computing the total finance charge payable over the full life of the loan for purposes of compiling the TILDS, they included the interest on "deferred interest" which would accrue because the scheduled monthly payments were insufficient to pay all monthly interest due on the loan.  The TILDS, however, did not disclose the fact that negative amortization was a certainty, or the amount of the total finance charge that resulted from this negative amortization.

72.     The only places in the Notes that even inferentially reference negative amortization suggest that negative amortization is only a mere possibility, rather than an

absolute certainty.  For instance, the Notes, at ¶ 5(a), state that "*If* the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect.  This practice is known as negative amortization."  And, at ¶ 5(c), the Notes state "For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal."  These statements were half-truths, because the Notes did not state that the payment schedule provided would absolutely guarantee that negative amortization was going to occur on these loans.

**B.    Failure to Disclose the Interest Rate Underlying the Payment Schedule.**

73.    12 C.F.R. §§ 226.17 and 226.19 require the lender to make disclosures concerning the payments in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose at all.

74.    The scheduled payment amounts and interest rate listed in the Note and TILDS for each of the subject loans are unclear because the payment amounts for the first three to five years are not based on the APR listed in the TILDS, but, instead, are based upon a rate listed in the Note that Defendants knew would exist for only thirty (30) days.  At all times relevant, the Loan Documents failed to disclose that even if Plaintiffs and Class Members made payments according to the payment schedule set forth in the TILDS, negative amortization was an absolute certainty.  Had Defendants clearly and conspicuously disclosed the payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment amounts would have been approximately double, or more than double, the payment amounts listed.

75.    Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states:  "This standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other…"

76.    At all times relevant, the Loan Documents violated 12 C.F.R. § 226.17(a)(1)
in that the relationship between the payments, for up to the first five years of the loans,
bore no relationship to the APR listed in the TILDS.  Therefore, the form of disclosure
used by Defendants obscured the relationship between the interest rate listed in the Notes
and the APR listed in the TILDS, and the monthly payments listed in the payment
schedule.

### C.    Failure to Disclose That the Initial Interest Rate Was Discounted.

77.    12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the
terms of the legal obligation between the parties."  Official Staff Commentary regarding
12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the credit terms to
which the parties are legally bound as of the outset of the transaction.  In the case of
disclosures required under  § 226.20(c), the disclosures shall reflect the credit terms to
which the parties are legally bound when the disclosures are provided."  The Official
Staff Commentary further states that "[t]he legal obligation normally is presumed to be
contained in the note or contract that evidences the agreement."  Official Staff
Commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a rate or
payment cap that would prevent the initial rate or payment, at the time of the first
adjustment, from changing to the rate determined by the index or formula at
consummation, the effect of that rate or payment cap should be reflected in the
disclosures."

78.    At all times relevant during the liability period, the Loan Documents
violated 12 C.F.R. § 226.17(c) in that the Notes and TILDS did not disclose that the
liability that Plaintiffs and Class Members were incurring was substantially greater than
the amount of their scheduled payments.  Further, Defendants failed to disclose to
Plaintiffs and Class Members that the initial interest rate was discounted, and that it was
absolutely certain to substantially increase after only one month, even when the index did
not rise.  To the extent that Defendants provided any disclosure that stated that the initial
payment was not based on the index, they failed to do so in a manner that was clear and

conspicuous, and that did not obscure its importance, or that was designed to be reasonably understood by the ordinary consumer.  Rather than disclose that the interest rate would increase after only one month, the Loan Documents stated that the initial payment was based on a "yearly rate" of 1-3%.  The Loan Documents did not clearly and unambiguously disclose that this initial rate was discounted, and would only last for one month.

**D.    Failure to Clearly and Conspicuously Disclose the Actual Interest Rate.**

79.    Defendants also failed to disclose to Plaintiffs and Class Members before they entered into the subject Option ARM loans all of the ways by which the interest rate applicable to the subject loans could increase, in violation of TILA.

80.    This violated 15 U.S.C. § 1638(a)(4), which requires lenders to disclose only one annual percentage rate ("APR") and not an additional APR that is only applicable for the first 30 days of a loan.

81.    It also violates the FRB's Official Staff Commentary to 12 C.F.R. § 226.(17)(C)-6, which requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

82.    It also violates 15 U.S.C. § 1638(a)(8) and 12 C.F.R. § 226.18(e), which requires lenders to provide a descriptive explanation of the APR, which is defined as the cost of credit expressed as a yearly rate.

83.    It also violates 12 C.F.R. § 226.17 (and the Official Staff Commentary thereto) and 12 C.F.R. § 226.19, which, together, require lenders to make disclosures concerning the APR in a clear and conspicuous manner.

84.    At all times relevant during the liability period, Defendants provided Plaintiffs and Class Members with Notes that state:  "I will pay interest at a yearly rate of [1.000% - 3.000%]."  However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE" describes the APR as "[t]he cost of your credit as a yearly rate"

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

and then lists a much higher APR than the rate listed in the Notes.  For instance, in the case of Plaintiffs Mr. and Mrs. Monaco, it listed an APR of "7.527%" and for Plaintiff Mr. Brandt, it listed an APR of "8.871%."

85.     Thus, the interest rate listed in the Notes conflicted with the APR stated in the TILDS.  For instance, in the case of Plaintiffs Mr. and Mrs. Monaco, the "1.000%" stated in the Note contradicts the "7.527%" APR that Defendants stated in the TILDS.  And for Plaintiff Mr. Brandt, the "1.000%" stated in the Note contradicts the "8.871%" APR that Defendants stated in the TILDS.

86.     At all times relevant during the liability period, Defendants failed to clearly and conspicuously explain in the Note or TILDS that the low rate (the same rate upon which Defendants based the written payment schedules provided to Plaintiffs and Class Members) was offered only for the first thirty (30) days of the loan.

87.     Defendants also failed to disclose to Plaintiffs and Class Members that the APR listed in the TILDS was not the APR or rate used to determine the first three to five years of payments listed in the very same TILDS, and that the listed payment amounts for the first three to five years of the loan were based on the interest rate stated in the Note, which was correct for no more than thirty days.

88.     The FRB's Official Staff Commentary to 12 C.F.R. § 226.17(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."  Additionally,

> in a variable-rate transaction with a...discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term.

89.     The reason for this requirement is clear.  Consumers cannot make an informed decision when they cannot compare the cost of credit to other proposals.  It therefore was incumbent upon Defendants to disclose to Plaintiffs and the Class Members

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

*before* they entered into the subject Option ARM loans the composite interest rate, and the amount of payments based thereon, so that these borrowers could understand exactly what they would be paying for the loan.

90.     For EMC MORTGAGE and the other Defendants who are in the business of making, purchasing and securitizing loans, the violations of TILA and Regulation Z described in this Complaint are objectively and  reasonably apparent on the face of the documents provided to Plaintiffs and Class Members, because the disclosures provided can be determined to be incomplete and inaccurate by a comparison among the TILDS, the other disclosure statements, and the Note described herein.

91.     WHEREFORE, Plaintiffs and Class Members are entitled to an order declaring that Defendants violated TILA, 15 U.S.C. §1601, et seq., that Plaintiff Brandt and the similarly situated National TILA Class members are entitled to statutory damages pursuant to 15 U.S.C. § 1640, attorneys fees, litigation costs and expenses and costs of suit, and for an order awarding other relief as the Court deems just and proper.

## VII.

## SECOND CLAIM FOR RELIEF

### Fraudulent Omissions

### (All Plaintiffs Against All Defendants)

92.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

93.     As alleged above, under TILA, Defendants had a duty to clearly and conspicuously disclose to Plaintiffs and each Class Member before they entered into the subject Option ARM loans: (i) the payment schedule for the first three to five years was not based upon the APR listed on the TILDS, (ii) that negative amortization would occur and that the "principal balance will increase"; (iii) that the initial interest rate on the note was discounted; and (iv) the applicable annual percentage rate ("APR").

/ / /

94.     Under common law, Defendants further had a duty to disclose to Plaintiffs, and Class Members that: (i) the promised low interest rate was only available for thirty days if at all; (ii) the payment rate for the first three to five years provided to Plaintiffs and Class Members on the TILDS was insufficient to pay the interest due each month, let alone both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members' residences was certain to occur if Plaintiffs and Class Members made payments according to the payment schedule provided by Defendants.

95.     BSRMC and certain DOE defendants are liable under this claim because they were the originator of Plaintiffs' loans and provided the deficient Loan Documents and disclosures to Plaintiffs and Class Members while concealing and omitting material information as alleged herein.  EMC MORTGAGE,  BEAR STEARNS and certain DOE defendants are liable under this claim for relief  (1)  as a result of their participation in a scheme wherein EMC and BEAR STEARNS designed the deficient Loan Documents with the intent to defraud borrowers who entered into the loans into believing that if the borrowers made the minimum payments stated in the TILDS, that the borrowers principal loan balance would *not* increase; EMC and BEAR STEARNS provided BSRMC and other originators with the deficient Loan Documents and disclosures, and directed (through written agreement(s)) and demanded that BSRMC and other originators  use those Loan Documents and disclosures, despite The Material Omissions, (2) to the degree they provided the deficient Loan Documents and disclosures to Plaintiffs and Class Members directly, and (3) because if BSRMC and other originators would not use the Loan Documents and disclosures discussed above, EMC and BEAR STEARNS would not securitize the mortgages of BSRMC and other originators, which would effectively stop BSRMC's and other originators' ability to fund and originate loans.  Thus, the role of EMC and BEAR STEARNS in securitizing the mortgages was essential to the ability of  BSRMC  and others  to originate new mortgages.  JPMORGAN CHASE is liable for

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1   violations of this claim for relief both as BSRMC's and BEAR STEARNS' successor-in-

2   interest and to the degree subject loans have been assigned or sold to it as a result of its

3   merger with BEAR STEARNS.

4       96.    Each of the Notes at issue states: "I will pay interest at a yearly rate of

5   1.000%. The interest rate I will pay *may* change in accordance with Section 4 of this

6   Note." Ex. 1, EMC-JM-00136; Ex. 2. EMC- JM 00769. (Emphasis added).  A truthful

7   disclosure would have been to tell Plaintiffs that "I will pay interest at a yearly rate of

8   1.000%. The interest rate I will pay will change when the first monthly payment becomes

9   due to a rate of [the sum of the index and margin – for the Monacos, approximately

10  7.375%; for Brandt, 8.75%.]" The combined index and margin were known to

11  Defendants but unknown to and concealed from Plaintiffs.  Had Defendants  plainly and

12  prominently disclosed this to Plaintiffs, at or before the time of closing,  Plaintiffs would

13  not have entered into the subject Option ARM loans.

14      97.    Each of the Notes at issue states:  "I will pay *principal and interest* by

15  making a payment every month." (Emphasis added.)  The Note then states, while

16  referencing the Payment Cap provision, that "[t]his Payment Cap applies only to the

17  *Principal and Interest* payment ..."  And, under the heading "BORROWERS FAILURE

18  TO PAY AS REQUIRED," the Note states "[t]he amount of the charge will be 5.000% of

19  my overdue payment of *Principal and Interest*." (Emphasis added.)  These partial

20  representations led Plaintiffs and Class Members to believe that in making the payments,

21  as presented to them at the time of signing, that they would be paying principal and

22  interest;  Defendants failed to disclose that the payment amounts prescribed in the Loan

23  Documents, in particular, the Note and TILDS, that they would not, in fact, cover

24  principal and interest, and were, in fact, certain to result in negative amortization.  This

25  information was known to Defendants but unknown to and concealed from Plaintiffs.

26  Had Defendants  plainly and prominently disclosed to Plaintiffs, at or before the time of

27  closing, the fact that the payments were woefully insufficient to even cover the interest on

28  the loan, let alone fully pay off the debt after 30 years, Plaintiffs would not have entered

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

into the subject Option ARM loans.

98.    The Notes further state: "*If* the Minimum Payment is not sufficient to cover the amount of interest due *then* any accrued but unpaid interest will be added to principal" i.e. negative amortization *may* occur." Ex. 1, EMC-JM 00138; Ex. 2, EMC-JM00771. (Emphasis added).[4]  However, the Minimum Payment that was presented to Plaintiffs and Class Members at or before the time of closing *was* certain to be woefully insufficient to cover the interest. In fact it was about 50% of the amount needed to pay the interest only, and thus negative amortization would, in fact, occur.  The Loan Documents fail to disclose the material fact that the amount set forth in the payment schedules provided by Defendants in the TILDS could not possibly cover the amount of interest due under *any* conceivable index rate plus the margin after the first 30 days.  To be accurate and complete, the Notes should have disclosed that if the borrowers followed the payment schedules set forth by Defendants, the Monthly Payments *would not* cover the amount of interest due and negative amortization *would in fact* occur.   Defendants could easily have disclosed this, to avoid any confusion or deception, but did not. This information was known to Defendants but unknown to and concealed from Plaintiffs. Had Defendants plainly and prominently disclosed to Plaintiffs, at or before the time of closing,  the fact that the scheduled  payments would not be  insufficient to even cover the interest on the loan, let alone fully pay off the debt after 30 years, Plaintiffs would not have entered into the subject Option ARM loans.

99.    The Notes further state, under "Additional Payment Options" that the "Lender *may* provide me with up to three (3) additional payment options ...." (Emphasis added.)  However, the so-called "Payment Options" that the lender "may provide" were not disclosed to Plaintiffs and Class members *before* they entered into the subject Option ARM loans; rather, it was only *after* Plaintiffs and Class Members entered into the loans

---

[4]  The same page of the Note states that "my monthly payment *could* be less than or greater than the amount of interest owed each month." See Ex. 1, EMC-JM 00138, ¶ 5©; Ex. 2, EMC-JM00771,  ¶ 5(c).

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

that they were provided crucial material information about the true cost of their loans, and by then, it was too late as the borrowers were already hooked into the loans, with their accompanying heavy prepayment penalties.  It was at that time that Mr. Brandt learned, for the first time, that his monthly interest only payment was $2,502.36, and the fully amortizing payment was $2,701.35, compared to a minimum (scheduled) payment of only $1,106.44. Similarly, Mr. and Mrs. Monaco learned that their interest-only payment was about $1,586 and the fully amortizing payment was about $1,782, compared to a minimum (scheduled) payment of only $829.83.  This information was known to Defendants but unknown to and concealed from Plaintiffs.  Had Defendants plainly and prominently disclosed to Plaintiffs, at or before the time of closing,  the fact that the scheduled  payments would not be  insufficient to even cover the interest on the loan, let alone fully pay off the debt after 30 years, Plaintiffs would not have entered into the subject Option ARM loans.

100.    The Notes list an interest rate and a payment amount based on that initial interest rate.  However, the TILDS that Defendants gave to Plaintiffs and Class Members before they entered into the subject loans included a schedule of payments (including that initial payment rate) but disclosed a different, much higher interest rate.  By stating the low teaser rate and associated monthly payment in the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were going to accrue on their loans. This information was known to Defendants but unknown to and concealed from Plaintiffs.  Had Defendants plainly and prominently disclosed to these facts Plaintiffs, at or before the time of closing,  Plaintiffs would not have entered into the subject Option ARM loans.

101.    The Notes further state, under "Amount of My Initial Monthly Payments" "Each of my initial monthly payments until the first Payment Change Date will be [$829.83 for the Monacos and $1106.44 for Brandt]. "However, under the terms of the subject Option ARM loans, the actual interest cost of Plaintiffs' and Class Member's

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

loans "payment" was *absolutely guaranteed to go up the very next month.*   In particular, Defendants' Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount to pay for the loan was absolutely guaranteed to go up. An open, obvious and honest disclosure would have informed Plaintiffs –in the very same part of the document that disclosed the monthly payment–that:

For the Monacos:

Each of my initial monthly payments until the first Payment Change Date will be $829.83. ***Beginning  with the first monthly payment date, the actual interest cost of my loan  will be about $ 1,586,*** based upon the Index currently in effect, so my payments will not be sufficient to pay the interest and my loan balance will increase. The interest cost of the loan will change if the index changes.

For Mr. Brandt:

Each of my initial monthly payments until the first Payment Change Date will be $1106.44. ***Beginning  with the first monthly payment date, the actual interest cost of my loan  will be about $2,502*** based upon the Index currently in effect, so my payments will not be sufficient to pay the interest and my loan balance will increase. The interest cost of the loan will change if the index changes.

This information was known to Defendants but unknown to and concealed from Plaintiffs.  Had Defendants plainly and prominently disclosed these facts to Plaintiffs, at or before the time of closing, Plaintiffs would not have entered into the subject Option ARM loans.

102.   The Notes each contained a prominent, capitalized preamble, which stated in part: "THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME . . . ."  This statement is false, as no provision in the Notes capped the amount by which interest rates could change each month.  Worse, this statement falsely suggests that the payment schedule, whose payments increased in fixed increments during the first three to five years of the loan term, contained payments

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

designed to track these purportedly capped interest rate changes.  Yet, the Loan Documents omitted the true facts, which was that the payments contained in the payment schedule were not tied in any way to changes in the interest rate applicable to the loan and would not satisfy the interest due on the loan.  This information was known to Defendants but unknown to and concealed from Plaintiffs.  Had Defendants plainly and prominently disclosed to these facts Plaintiffs, at or before the time of closing,  Plaintiffs would not have entered into the subject Option ARM loans.

103.   Defendants purposefully and intentionally devised this Option ARM loan scheme of stating only partially true facts and omitting important material information in order to deceive consumers into believing that these loans would provide a low-interest rate loan for the first three to five years of the Note and that if they made their payments according to the payment schedule provided by Defendants their payments would be sufficient to pay both principal and interest.

104.   Defendants EMC and BEAR STEARNS designed, created, and supplied the loan documents and disclosures, and BSRMC was aware of the loan documents and disclosures and their contents as well.  Defendants EMC and BEAR STEARNS knew that BSRMC and other originators would sell these loans, and that BSRMC and other originators would provide borrowers, including Plaintiffs, with the TILDS, and loan documents and disclosures, before borrowers could enter into the Option ARM loans. Defendants EMC and BEAR STEARNS further knew, but intended not to clearly disclose, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days, and which would, in fact, drastically increase after thirty days, and BSRMC knew but intended not to disclose this fact as well.  Defendants EMC and BEAR STEARNS knew, but intended not to disclose in the loan documents or disclosures, that negative amortization was *guaranteed* if borrowers made these listed low payments in the Note and TILDS, and BSRMC knew but intended not to disclose this fact as well.  Defendants EMC and BEAR STEARNS further knew, but intended not to clearly disclose, that the listed payments set forth in the

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original principal balance, and BSRMC knew of but intended not to disclose this fact as well.  This information was material to Plaintiffs and to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (i.e., the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.  Defendants EMC and BEAR STEARNS could have easily disclosed, and BSRMC could have easily disclosed (even though the documents provided to it by EMC and BEAR STEARNS did not), and should have accurately and clearly disclosed, that if borrowers paid the remaining payments listed on the TILDS they would in fact be paying 115% of the balance of the original financed amount, rather than merely the balance of the original amount financed.  But Defendants did not disclose the omitted facts in order to perpetuate their fraudulent scheme as alleged herein.

105.    At all times relevant, Defendants had exclusive knowledge of these material facts, but actively concealed the material facts from Plaintiffs and Class Members. Plaintiffs relied on the interest rate and monthly payments specified in the Notes and other Loan Documents to  be fully amortizing, and believed that making the payments specified in the loan documents would reduce their loan balances, not increase them. Had Defendants plainly and prominently disclosed to these facts Plaintiffs, at or before the time of closing,  Plaintiffs would not have entered into the subject Option ARM loans

106.    At or before closing, Plaintiffs reviewed the Loan Documents, reading material portions of the Loan Documents, particularly those portions which concerned the interest rate and payment amounts that Plaintiffs would have to pay for the loan. Plaintiffs read and scanned the Loan Documents to make sure that the loan they thought they were getting was in fact the loan they were signing. What they read was only partially true, and concealed and failed to disclose material information, known to

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

defendants but unknown to plaintiffs, that the interest rate was *certain* to drastically increase by the time the first monthly payment was due, and that the monthly payment was *only about  than half* of what was needed to pay the interest. Had Defendants plainly and prominently disclosed to these facts Plaintiffs, at or before the time of closing,  Plaintiffs would not have entered into the subject Option ARM loans.

107.    At or before closing, plaintiff Joseph Monaco generally reviewed the Note and Rider, read at least page 7 of the Note (i.e., the first page of the Rider), and read BSRMC's TILDS ( which included the payment schedule on which he initialed each page) and Program Disclosure.  Similarly, plaintiff Anita Monaco briefly read the Note and read the TILDS (and initialed each page).  In entering into their Option ARM loan, the Monacos relied on misleading statements and omissions in the documents, including the representation (which appeared on both the first page of the Note and Rider) regarding an alleged 1% "yearly rate" of interest, and relied on the absence of any disclosure that the loan's principal balance would in fact increase if they made the scheduled payments.  The Monacos' understanding, at the time of closing, was that the principal balance would not go up if they made scheduled payments.  They did not learn until some time afterwards that it was, in fact, going up.  No one disclosed the truth to them prior to closing.

108.    Similarly, plaintiff James Brandt read the first page of the Note, the monthly payment portion and other portions of the Loan Documents and relied on the statements concerning the interest rate and the payment amounts.  While Defendants knew (and Mr. Brandt did not) at the time of closing that Mr. Brandt's principal balance would immediately start to increase if he made the scheduled payments, they elected not to clearly disclose this to him anywhere in the Loan Documents.  Brandt's understanding, at the time of closing, was that the principal balance would not go up if he made scheduled payments.  He did not learn until some time afterwards that it was, in fact, going up.   No one disclosed the truth to him prior to closing.

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

109.    Had the Note clearly disclosed the truth to Plaintiffs – that the introductory
interest rate (misleadingly referenced as a "yearly rate") referenced on the first page was
ephemeral, *certain* to immediately and drastically increase and *certain* to result in an
increased principal balance –  Plaintiffs would have known the truth and would have
acted differently; i.e., they would not have entered into the loans. Similarly, had the
TILDS truthfully disclosed that making the monthly payments itemized in the TILDS
would result in an increase in the principal balance, Plaintiffs would not have entered into
the loans.  Stated another way, had the TILDS fairly and truthfully disclosed the much
higher amounts of money that Plaintiffs would need to pay each month in order to avoid
an increase in their principal balance, Plaintiffs would not have entered into the loans.
Indeed, the Monacos understood they had a statutory right to cancel within three days and
did not exercise that right because they did not understand that their principal balance
was going to immediately start increasing if they made their scheduled payments.  Had
they been informed by Defendants that their principal balance was going to immediately
start increasing if they made their scheduled payments, they would have cancelled the
loan.

110.    The omitted information, as alleged herein, was objectively material
information with respect to both the interest rate and the amount of payments, which are
the two most important features of any mortgage loan.  It was also material information
to Plaintiffs because, had Defendants disclosed this information, Plaintiffs and Class
Members would not have entered into the subject Option ARM loans.

111.    As a direct and proximate result of Defendants' failures to disclose and
omission of material facts, as alleged herein, Plaintiffs and Class Members have suffered
damages, which include, but are not limited to the loss of equity Plaintiffs and each Class
Member had in their homes prior to entering these loans.

112.    The wrongful conduct of Defendants, as alleged herein, including
Defendants' placing of their corporate and/or individual profits over the rights of others,
was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious,

malicious and in conscious disregard for the well being of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and the general public.  Accordingly, Plaintiffs and Class Members are entitled to an award of punitive damages against Defendants in an amount to deter them from similar conduct in the future.

113.    WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, exemplary damages, unjust enrichment (legal restitution), prejudgment interest and costs.

## VIII.

## THIRD CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law,

### Bus. & Prof. Code §§ 17200 *et. seq.*

### "Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices

### (All Plaintiffs Against All Defendants)

114.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

115.    This claim is brought by Plaintiffs individually, as representatives on behalf of the Class Members, and in their capacities as private attorneys general, against all Defendants for their unlawful, unfair, fraudulent and/or deceptive business acts and/or practices pursuant to the California Business & Professions Code sections 17200 *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent business acts and/or practices.

/ / /

116.   Plaintiffs assert these claims as representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by California Business & Professions Code §§ 17200, *et seq.*

117.   The instant claim is predicated on the generally applicable duty of any contracting party to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business practices.  Plaintiffs and Class Members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

118.   Plaintiffs and Class Members were consumers who applied for a mortgage loan through Defendants.  During the loan application process, in each case, Defendants uniformly failed to disclose and omitted material information that was known only to Defendants and that could not reasonably have been discovered by Plaintiffs and Class Members as set forth in the preceding claims for relief.  Every Class Member was provided with and exposed to the misleading Loan Documents containing the Material Omissions and misleading partial representations.   Had Plaintiffs and Class members not been provided with and/or required to sign the misleading Loan Documents, they would not have entered into the subject loans, and Defendants would not have acquired money and/or property from them by means of the conduct challenged herein.

119.   Based on The Material Omissions and Defendants' other partially true statements and failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their homes through the subject Option ARM loans, and have been actually harmed.

120.   Defendants intended that Plaintiffs would be misled into believing that, if they made payments based on the payment schedules provided to them before they entered into the subject loan, the principal balance would be reduced with each payment

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1    when it actually increased with each payment.  The Loan Documents were designed and

2    used for this purpose.  Plaintiffs relied on the interest rate and monthly payments

3    specified in the Note and other loan documents to be fully amortizing, and believed that

4    making the payments specified in the loan documents would reduce their loan balances,

5    not increase them.  The truth was that making the specified payments would increase

6    their loan balances.  Defendants easily could have included a disclosure such as:  "If you

7    make the payments called for by this Note and the schedule in the TILDS, the principal

8    balance of your loan will increase."  However, Defendants elected not to clearly disclose

9    such basic, truthful information, for profit reasons.  Plaintiffs and borrowers were, as a

10    result, lured into risky loans that they would not have entered into had they been told the

11    truth.  This conduct violated the UCL.

12        121.    Defendants designed, created, supplied, or were aware of the TILDS which

13    set forth low payments for the first three to five years of the loan.   Defendants further

14    knew, but did not clearly disclose, that these listed low payments in the TILDS were

15    predicated on an interest rate which would not, in fact, exist after the first thirty days.

16    Defendants knew, but did not disclose, that negative amortization was *guaranteed* if

17    borrowers made these listed low payments.  Defendants further knew, but did not

18    disclose, that the listed payments set forth in the TILDS were calculated such that, if the

19    payments were made, borrowers actually would be paying off 115% of the original

20    principal balance.  This information was material to any reasonable borrower, and the

21    omission of such material information would cause a reasonable borrower to believe that

22    the fully amortizing payments shown on the TILDS were in fact those payments

23    necessary to pay off the balance of the original amount financed (i.e., the original

24    principal balance less principal payments made on account of that balance), rather than

25    115% of the amount financed.  Defendants could have easily disclosed, and should have

26    accurately and clearly disclosed, that if borrowers paid the remaining payments listed on

27    the TILDS they would in fact be paying 115% of the balance of the original financed

28    amount, rather than merely the balance of the original amount financed.  But Defendants

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1  chose not to do so in furtherance of their unfair and misleading scheme.

2       122.   By engaging in the above-described acts and practices, Defendants, and each

3  of them, have committed one or more acts of unfair competition within the meaning of

4  California Business & Professions Code §§ 17200, *et seq.*

5       123.   <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above

6  constitute unlawful business acts and/or practices within the meaning of California

7  Business & Professions Code §§ 17200, *et seq.*  Defendants' unlawful business acts

8  and/or practices as alleged herein have violated numerous laws and/or regulations -

9  federal and/or state, statutory and/or common law - and said predicate acts are therefore

10 *per se* violations of §17200, *et seq.*  These predicate unlawful business acts and/or

11 practices include, but are not limited to, the following:  TILA, 15 U.S.C. §1601, *et seq.* as

12 alleged in § II above;  Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41-58,

13 specifically,15 U.S.C. § 45(a)(1).[5];California Civil Code §§ 1572 (Actual Fraud -

14 Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit).

15      124.   <u>Unfair</u>: Defendants' omissions and misconduct as alleged in this action

16 constitutes negligence and other tortious conduct and this misconduct gave Defendants an

17 unfair competitive advantage over competitors that did not engage in the same

18 misconduct.

19      125.   Defendants' misconduct as alleged above and herein was unfair because (i)

20 it caused Plaintiffs and Class Members substantial injury by, among other things, causing

21 them to lose equity in their homes, (ii) there were absolutely no countervailing benefits to

22 consumers or to competition that could possibly outweigh this substantial injury, and (iii)

23 this injury could not have been avoided or even discovered by the consumers, because it

24 resulted from Defendants' failure to disclose and/or omission of material information that

25 only the Defendants knew or should have known.

26

27 [5]  15 U.S.C. § 45(a)(1) states: "Unfair methods of competition in or affecting commerce,
   and unfair or deceptive or practices in or affecting commerce, are hereby declared
28 unlawful."

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

126.    The Material Omissions and other misconduct of Defendants alleged herein is and was likely to deceive the public, and violated the public policy as declared by statutory and regulatory provisions such as the provisions of TILA and California's statutory fraud provisions, enumerated elsewhere herein.

127.    The harm to Plaintiffs, members of the general public and Class Members outweighs the utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein constitutes an unfair business act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq.* Defendants' misconduct as alleged herein gave also Defendants an unfair competitive advantage over Defendants' competitors that did not engage in similar conduct.

128.    <u>Fraudulent</u>: Through their omissions and/or acts, practices and non-disclosures as alleged herein, Defendants designed the Loan Documents in order to deceive the public through the Material Omissions  leading to consumer confusion, including, but not limited to the fact that, for the first three to five years, the loans were negatively amortizing loans.  Said omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*

129.    Defendants' conduct, as fully described above, was designed to and was therefore likely to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

130.    As a direct and proximate result of the aforementioned omissions, acts and practices, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiffs and Class Members similarly situated who purchased the Option ARM loans as described herein.

131.    The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by Defendants' form Loan Documents forms at issue, as described

herein.  Plaintiffs and other members of the general public have no other remedy of law
that will prevent Defendants' misconduct as alleged herein from occurring and/or
reoccurring in the future.

132.   As a direct and proximate result of Defendants' unfair and/or fraudulent
conduct alleged herein, Plaintiffs and Class Members have lost hundreds of thousands if
not millions of dollars of equity in their homes.  Plaintiffs and Class Members are direct
victims of the Defendants' unlawful conduct, and each has suffered injury in fact, and has
lost money or property as a result of Defendants' unfair competition.

133.   WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief,
including restitution, restitutionary disgorgement of all profits accruing to Defendants
because of their unfair, fraudulent, and deceptive acts and/or practices, attorney's fees
and costs, declaratory relief, and a permanent injunction enjoining Defendants from their
unfair, fraudulent and deceitful activity.

## IX.

## FOURTH CLAIM FOR RELIEF

### Breach of Contract

**(All Plaintiffs Against BSRMC, EMC as the assignee of BSRMC, and JP Morgan
Chase as the legal successor in interest to BSRMC)**

134.   Plaintiffs incorporate paragraphs 1-63 above as though fully set forth herein.

135.   Plaintiffs and other Class Members entered into a written home loan
agreement – the contract or Note – with Defendants which describe terms and respective
obligations applicable to the parties herein.     The material terms of all Class Members'
contracts, relevant herein, were substantially the same.  The contracts were supported by
good and valuable consideration.  Plaintiffs and Class Members have performed all
conditions, covenants and promises required on their part to be performed in accordance
with the terms and conditions of the contract.

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

136.   Defendants provided the Note, TILDS and Program Disclosure to Plaintiffs and each member of the Class with the intention and desire that Plaintiffs and each member of the Class accept their terms.  Defendants drafted the Notes and did not allow Plaintiffs or Class Members any opportunity to make changes to the Notes and, due to Defendants' superior bargaining position, the Notes were offered on a "take it or leave it" basis.  As such, the Notes and the prepayment penalty riders to the Notes are contracts of adhesion.

137.   Each Note and TILDS expressly and impliedly required Defendants to apply Plaintiffs' and Class Members monthly payments to both principal and interest on a fully-amortized basis (*i.e.*, so that negative amortization would not occur) as long as those payments were in the amount reflecting in the Note and the TILDS.  The Notes and the TILDS identified the monthly payments Plaintiffs and the Class Members were required to make.  Defendants were not permitted to impose or charge any different payment amount.  As alleged herein, the Notes expressly state and/or imply that those payments would be applied to pay both Principal and interest on the loan.

138.   Defendants have breached their obligations under the Note.  Rather than applying Plaintiffs' and Class Members' payments to principal and interest as required by the terms of the Note, Defendants applied Plaintiffs' and Class Members' payments only to a portion of the interest that accrued each month and to no principal at all.  Indeed, Defendants have increased the purported principal balance due on Plaintiffs' and Class Members' loans by capitalizing the purportedly unpaid interest and have charged interest on these new, higher loan balances – effectively charging Plaintiffs and the Class Members compound interest, which is also prohibited by the Note's terms.

139.   As a result of Defendants' breach of the agreement, Plaintiffs and Class Members have suffered damages in an amount to be proven at trial.  These damages include, but are not limited to the following:

   a.   Plaintiffs' and Class Members' loan balances have not decreased as they made their monthly mortgage payments.  On the contrary,

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

Plaintiffs and Class Members purportedly owe more on their loans today than they did when they started.

b.    Plaintiffs and Class Members have incurred and continue to incur excess interest charges, as the interest due on their loans is calculated using these inflated principal balances.

c.    Defendants' breach has placed Plaintiffs and Class Members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and Class Members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

140.    At all times relevant, there existed a gross inequality of bargaining power between the parties to the Loan Documents.  At all times relevant, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon Plaintiffs and Class Members extremely harsh, one-sided provisions in the contract, which Plaintiffs and Class Members were not made aware of and could not reasonably have comprehended  (*e.g*., Defendants' fraud and failures to disclose as alleged herein), and which attempt to severely limit Defendants' obligations under the contracts at the expense of Plaintiffs and Class Members, as alleged herein.

141.    WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

# X.

## FIFTH CLAIM FOR RELIEF

### Tortious Breach of Implied Covenant of Good Faith and Fair Dealing

### (ALL Plaintiffs Against BSRMC, EMC as the assignee of BSRMC, and JP Morgan Chase as the legal successor in interest to BSRMC)

142.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

143.    As a direct and proximate result of the omissions and failures to disclose as alleged herein, Plaintiffs and the Class members reasonably expected that their payments, for the first two (2) to five (5) years of the Defendants' loans at issue would decrease the balance due under the loans, rather than increase them.

144.    At all times relevant during the liability period, Defendants consciously and deliberately failed to apply Plaintiffs' and Class Members' payments in accordance with the reasonable expectations of Plaintiffs and the Class Members and uniformly misapplied the payments therein, which unfairly frustrated the agreed common purposes and disappointed the reasonable expectations of Plaintiffs and Class Members.

145.    Defendants uniformly and unfairly interfered with Plaintiffs' and Class Members' rights to receive the principal benefit of the contract, *i.e.*, ownership of their homes.  Defendants' loans have stripped away a substantial portion of the equity Plaintiffs and Class Members had in their homes and, in some cases, have actually resulted in the complete loss of their homes through foreclosure.

146.    Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and otherwise sold these Option ARM loans throughout the United States, including the State of California.

147.    Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of

each corporate defendant and/or taken with the advance knowledge of the officers,

directors, and/or managing agents who authorized and/or ratified said acts and/or

omissions.  Defendants thereby acted with malice and complete indifference to and/or

conscious disregard for the rights and safety of others, including Plaintiffs and the

general public.

148.    At all times relevant, Defendants' conduct, as alleged herein, was malicious,

oppressive, and/or fraudulent.

149.    As a result of Defendants' conduct, Plaintiffs and Class Members have

suffered harm.  Plaintiffs and Class Members have incurred additional charges to their

principal loan balance.  Plaintiffs and Class members have incurred and will continue to

incur additional interest charges on the principal loan balance and surplus interest added

to Plaintiffs' and Class Members' principal loan balance.  Furthermore, Defendants'

breach has caused and/or otherwise placed Plaintiffs and Class Members in danger of

losing their homes through foreclosure and limited these consumers' ability to  obtain

alternative home loan financing.

150.    WHEREFORE, Plaintiffs and Class Members are entitled to declaratory

relief, all damages proximately caused by Defendants' breach of the implied covenant of

good faith and fair dealing as alleged herein, pre-judgment interest, costs of suit and other

relief as the Court deems just and proper.

# XI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all Class Members pray for judgment against each

Defendant, jointly and severally, as follows:

A.    An order certifying this case as a class action and appointing Plaintiffs and
their counsel to represent each of the Classes;

B.    For actual damages according to proof;

C.    For compensatory damages as permitted by law;

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

| | | |
|---|---|---|
| 1 | D. | For statutory damages as permitted by law; |
| 2 | E. | For punitive damages as permitted by law; |
| 3 | F. | For unjust enrichment and/or legal restitution; |
| 4 | G. | For rescission of the named Plaintiffs' individual loans; |
| 5 | H. | For equitable relief, including restitution; |
| 6 | I. | For restitutionary disgorgement of all profits Defendants obtained as a result |
| 7 | | of their unfair competition; |
| 8 | J. | For interest as permitted by law; |
| 9 | K. | For declaratory relief; |
| 10 | L. | For injunctive relief; |
| 11 | M. | For reasonable attorneys' fees and costs; and |
| 12 | N. | For such other relief as is just and proper. |

DATED: February 3, 2011

**SPIRO MOSS LLP**

By: _____

J. Mark Moore
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468
Fax:    (310) 235-2456

**WILLIAMS CUKER & BEREZOFSKY**
Mark R. Cuker (admitted *pro hac vice*)
Michael J. Quirk (admitted *pro hac vice*)
1515 Market Street, Suite 1300
Philadelphia, PA 19102
Tel.: (215) 557-0099
Fax: (215) 557-0673

**ARBOGAST & BERNS LLP**
David M. Arbogast
Jeffrey K. Berns
6303 Owensmouth Ave., 10th Floor
Woodland Hills, CA 91367-2263
Tel.: (818) 961-2000
Fax: (818) 936-0232

/ / /
/ / /

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

1

**BROWNE WOODS GEORGE  LLP**
Eric M. George (SBN 166403)
egeorge@bwgfirm.com
Allan Browne (SBN 34923)
abrowne@bwgfrim.com
Michael A. Bowse (SBN 189659)
Mbowse@bwgfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Tel.: (310) 274-7100
Fax: (310) 275-5697

2

3

4

5

6

7

**SMOGER & ASSOCIATES**
Gerson H. Smoger (SBN 79196)
gersonsmoger@gmail.com
Steven M. Bronson (SBN 246751)
steven.bronson@gmail.com
3175 Monterey Blvd
Oakland, CA, 94602-3560
Tel.: (510) 531-4529
Fax: (510) 531-4377

8

9

10

11

12

Attorneys for Plaintiffs and the putative Class.

13

**DEMAND FOR JURY TRIAL**

14

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

15

16

DATED: February 3, 2011

**SPIRO MOSS LLP**

17

By

18

J. Mark Moore
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468
Fax:    (310) 235-2456

19

20

21

**WILLIAMS CUKER & BEREZOFSKY**
Mark R. Cuker (admitted *pro hac vice*)
Michael J. Quirk (admitted *pro hac vice*)
1515 Market Street, Suite 1300
Philadelphia, PA 19102
Tel.: (215) 557-0099
Fax:  (215) 557-0673

22

23

24

25

**ARBOGAST & BERNS LLP**
David M. Arbogast
Jeffrey K. Berns
6303 Owensmouth Ave., 10th Floor
Woodland Hills, CA 91367-2263
Tel.: (818) 961-2000
Fax:  (818) 936-0232

26

27

28

54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BROWNE WOODS GEORGE  LLP**
Eric M. George (SBN 166403)
egeorge@bwgfirm.com
Allan Browne (SBN 34923)
abrowne@bwgfirm.com
Michael A. Bowse (SBN 189659)
Mbowse@bwgfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA 90067
Tel.: (310) 274-7100
Fax: (310) 275-5697

**SMOGER & ASSOCIATES**
Gerson H. Smoger (SBN 79196)
gersonsmoger@gmail.com
Steven M. Bronson (SBN 246751)
steven.bronson@gmail.com
3175 Monterey Blvd
Oakland, CA, 94602-3560
Tel.: (510) 531-4529
Fax: (510) 531-4377

Attorneys for Plaintiffs and the putative Class.

SECOND AMENDED CLASS ACTION COMPLAINT - 2:09-cv-05438-SJO (JCx)

# EXHIBIT NO. 1

EXHIBIT 1



## ADJUSTABLE RATE NOTE
(12-month average yield on actively traded US Treasury Securities --Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY RATE CHANGES AND ANNUAL PAYMENT CHANGES. THIS NOTE ALLOWS ME TO CAP MY PAYMENTS. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).

| April 10, 2006 | Orange | CA |
|---|---|---|
| [Date] | [City] | [State] |

2804 Paxton Avenue, Palmdale, CA 93551

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $258,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Bear Stearns Residential Mortgage Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **1.000**%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **June, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **May 01, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **600 Anton Boulevard, Suite 1224, Costa Mesa, CA 92626** or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 1 of 6)*





Each of my initial monthly payments will be in the amount of U.S. **$829.83**. This amount may change.

    (C)    **Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

**4.**    **ADJUSTABLE INTEREST RATE**

    (A)    **Interest Rate Change Dates**

The interest rate I will pay will change on the **1st** day of **June, 2006**, and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

    (B)    **The Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

    (C)    **Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Three And Fifty Hundredths** percentage points (**3.500%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

**Limits on Interest Rate Changes**

My interest rate will never be greater than **9.950%**. My interest rate will never be lower than **3.500%**.

    (E)    **Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date.

**5.**    **PAYMENT CHANGES**

    (A)    **Payment Change Dates**

My monthly payment may change as required by Section 5(B) below beginning on the **1st** day of **June, 2007**, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 2 of 6)*



 

will accept for my monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

**(B)    Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E) or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

**(C)    Additions to My Unpaid Principal**

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5 (B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

**(D)    Limit on My Unpaid Principal; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

**(E)    Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(F)    Additional Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

BEAR SELECT NOTE-MULTISTATE                                           *(page 3 of 6)*
MTA-Twelve Month Average Index
BSR 4004





(i) Interest Only Payment: Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) Fully Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) 15 Year Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

(G)     Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

6.     BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

7.     LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

8.     BORROWER'S FAILURE TO PAY AS REQUIRED

(A)     Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 4 of 4)*



 

**(B)**     **Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)**     **Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)**     **No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**9.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**10.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**11.     WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index                                                                    *(page 5 of 6)*
BSR 4004



THIS IS CERTIFIED TO BE A TRUE AND EXACT COPY OF THE ORIGINAL DOCUMENT

EMC-JM 00140

 

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

......................................................... (Seal)
-Borrower Joseph A. Monaco, Jr

......................................................... (Seal)
-Borrower

......................................................... (Seal)
-Borrower

......................................................... (Seal)
-Borrower

[Sign Original Only]

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

*(page 6 of 6)*

THIS IS CERTIFIED TO BE A
TRUE AND EXACT COPY OF
THE ORIGINAL

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

Bear Stearns Residential Mortgage Corporation
600 Anton Boulevard, Suite 1224
Costa Mesa, CA 92626

BORROWERS:Joseph A. Monaco, Jr

[x] Preliminary   [ ] Final
DATE: 04/10/2006
LOAN NO.: 14891584
Type of Loan: Conventional
APP NO.:14891584

ADDRESS: 2804 Paxton Avenue
CITY/STATE/ZIP: Palmdale, CA      93551
PROPERTY: 2804 Paxton Avenue, Palmdale, CA  93551

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.527 % | $ 460,347.00 | $ 251,301.84 | $ 711,648.84 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 13 | $829.83 | 06/01/2006 | | | |
| 11 | $892.37 | 06/01/2007 | | | |
| 12 | $958.98 | 06/01/2008 | | | |
| 12 | $1,030.90 | 06/01/2009 | | | |
| 5 | $1,108.22 | 06/01/2010 | | | |
| 306 | $2,158.36 | 12/01/2010 | | | |

DEMAND FEATURE:   [X] This loan does not have a Demand Feature.   [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE: THE CURRENT INDEX RATE IS 3.888%
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at: 2804 Paxton Avenue, Palmdale, CA  93551

ASSUMPTION:   Someone buying this property   [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:      $ **See HUD1

PROPERTY INSURANCE:   [X] Property hazard insurance in the amount of $258,000.00   with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance  [ ] is  [X] is not available through the lender at an estimated cost of _____ for a _____ year term.

LATE CHARGES:   If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment.

PREPAYMENT:   If you pay off your loan early, you
[X] may   [ ] will not   have to pay a penalty.
[ ] may   [X] will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____        _____
Joseph A. Monaco, Jr          BORROWER/DATE                    BORROWER/DATE

_____        _____
                              BORROWER/DATE                    BORROWER/DATE

14891584                  **e means estimate**                    14891584

EMC-JM 00132

 

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

14891584

14891584

Initials: _____

VMP -788 (0310)

Page 2 of 2

EMC-JM 00133

04/18/2006  16:39  714-7127851    WESTERN RESOURCES    PAGE  22/23

Loan No. 14891584

## PREPAYMENT RIDER
### (Multi-State)

MIN  100386100002123214

This Prepayment Rider is made this 10th day of April, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Debt Instrument") to Bear Stearns Residential Mortgage Corp (the "Lender") of the same date and covering the property described in the Security Instrument and located at

2804 Paxton Avenue
Palmdale, CA 93551
(the "Property")

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Debt Instrument, any addenda to the Debt Instrument or the Security Instrument, Borrower and Lender covenant, and agree as follows:

Subject to the prepayment penalty provided below, I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid principal due under the Debt Instrument. A payment of only part of the unpaid principal is known as a "partial prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payment due under the Debt Instrument.

**If, within the 36 - month period beginning with the date I execute the Debt Instrument (the "Penalty Period"), I make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, I will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of (a) the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Debt Instrument, calculated at the rate of interest in effect under the terms of the Debt Instrument at the time of the prepayment; or (b) the maximum allowable prepayment penalty permitted by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

BSR 1024 Prepay Rider- Hard



EMC-JM 00039

04/18/2006  16:39     714-7127851                    WESTERN RESOURCES                        PAGE  23/23

The Note Holder will apply all prepayments to reduce the amount of principal that I owe under the Debt Instrument. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of the Debt Instrument. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If the Debt Instrument is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase. If the Debt Instrument is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge. Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Security Instrument are unchanged and remain in full force and effect.

**BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of the Rider.**

_____ (Seal)      _____ (Seal)
Joseph A. Monaco, Jr         Borrower                                    Borrower

_____ (Seal)      _____ (Seal)
Anita M. Monaco              Borrower                                    Borrower

_____ (Seal)      _____ (Seal)
                             Borrower                                    Borrower

_____ (Seal)      _____ (Seal)
                             Borrower                                    Borrower

BSR 1024 Prepay Rider- Hard



EMC-JM 00040

# EXHIBIT NO. 2

EXHIBIT 2

# ADJUSTABLE RATE NOTE
### (12-month average yield on actively traded US Treasury Securities --Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO
AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY
ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY
RATE CHANGES AND ANNUAL PAYMENT CHANGES. THIS NOTE
ALLOWS ME TO CAP MY PAYMENTS. THIS NOTE MAY REQUIRE UNPAID
INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY
ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE
AMORTIZATION).

| April 24, 2007 | Santa Clarita | CA |
|---|---|---|
| [Date] | [City] | [State] |

25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355
[Property Address]

25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355
[Borrower's Current Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $344,000.00 (this amount is
called "Principal"), plus interest, to the order of Lender.  Lender is Bear Stearns Residential
Mortgage Corporation located at 1241 E Dyer Road, Suite 110, Santa Ana, CA
92705.  I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by
transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I
will pay interest at a yearly rate of 1.000%. The interest rate I will pay may change in accordance with
Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both
before and after any default described in Section 8(B) of this Note.

## 3.    PAYMENTS

(A)    Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on June, 2007.  I
will make these payments every month until I have paid all of the principal and interest and any other
charges described below that I may owe under this Note. Each monthly payment will be applied as of its
scheduled due date and will be applied to interest before Principal. If, on May 01, 2037, I still owe
amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PMT Processing Dept, P. O. Box 225749,
Dallas, TX  75222-5749 or at a different place if required by the Note Holder.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 1 of 4)



CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

EMC-JM 00769

(B)     Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,106.44. This amount may change.

(C)     Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

4.      ADJUSTABLE INTEREST RATE

(A)     Interest Rate Change Dates

The interest rate I will pay will change on the 1st day of June, 2007, and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

(B)     The Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C)     Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Three And Seventy Five Hundredths** percentage points (3.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

Limits on Interest Rate Changes

My interest rate will never be greater than 9.950%. My interest rate will never be lower than 3.750%.

(E)     Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date.

5.      PAYMENT CHANGES

(A)     Payment Change Dates

My monthly payment may change as required by Section 5(B) below beginning on the 1st day of June, 2008, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 2 of 6)

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

EMC-JM 00770

will accept for my monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

**(B)    Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E) or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

**(C)    Additions to My Unpaid Principal**

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5 (B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal

**(D)    Limit on My Unpaid Principal; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

**(E)    Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(F)    Additional Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

BEAR SELECT NOTE-MULTISTATE                                                          (page 3 of 4)
MTA-Twelve Month Average Index
BSN, 4054

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

(i) Interest Only Payment: Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) Fully Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) 15 Year Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

(G)    Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 6.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 7.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 8.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A)    Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004                                                                                 (page 4 of 6)

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**9.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**10.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**11.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

BEAR SELECT NOTE-MULTISTATE                                                                    *(page 5 of 6)*
MTA-Twelve Month Average Index
BSR 4204

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

............................................................ (Seal)
-Borrower  JAMES A BRANDT

............................................................ (Seal)
-Borrower

............................................................ (Seal)
-Borrower

............................................................ (Seal)
-Borrower

[Sign Original Only]

BEAR SELECT NOTE-MULTISTATE
MTA-Twelve Month Average Index
BSR 4004

(page 6 of 6)

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

EMC-JM 00774

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

Bear Stearns Residential Mortgage Corp
1241 E Dyer Road, Suite 110
Santa Ana, CA  92705

BORROWERS: JAMES A BRANDT

☐ Preliminary  ☒ Final
*DATE:* 04/24/2007
*LOAN NO.:* 20727772
*Type of Loan:* Conventional
APP NO.: 20727772

ADDRESS: 25943 SANDALIA DRIVE
CITY/STATE/ZIP: SANTA CLARITA, CA    91355
PROPERTY: 25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 8.871 % | $ 737,462.38 | $ 337,426.58 | $ 1,074,888.96 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING |
|---|---|---|---|---|---|
| 12 | $1,106.44 | 06/01/2007 | | | |
| 12 | $1,189.42 | 06/01/2008 | | | |
| 12 | $1,278.63 | 06/01/2009 | | | |
| 324 | $3,185.17 | 06/01/2010 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

DEMAND FEATURE:  ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE: THE CURRENT INDEX RATE IS 5.027%
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at: 25943 SANDALIA DRIVE, SANTA CLARITA, CA  91355

ASSUMPTION:   Someone buying this property  ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:   $ **See HUD1

PROPERTY INSURANCE:   ☒ Property hazard insurance in the amount of $344,000.00    with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance  ☐ is  ☒ is not available through the lender at an estimated cost of    for a    year term.

LATE CHARGES:   If your payment is more than 15 days late, you will be charged a late charge of   5.000 % of the overdue payment.

PREPAYMENT:   If you pay off your loan early, you
☒ may  ☐ will not    have to pay a penalty.
☐ may  ☒ will not    be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    4/24/07   _____
JAMES A BRANDT    BORROWER/DATE    BORROWER/DATE

_____    BORROWER/DATE    _____  BORROWER/DATE

20727772    **e means estimate**    20727772

-788 (0310)    VMP Mortgage Solutions (800)521-7291    Page 1 of 2    10/03
©2003 CBF Systems, Inc. The contents of this form in whole or in part are protected under the copyright laws of the United States.

EMC-JM 00735

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

20727772

20727772



-788 (0310)

Page 2 of 2

EMC-JM 00736

**Bear Stearns Residential Mortgage Corporation**

## ADJUSTABLE RATE LOAN PROGRAM DISCLOSURE
### (This is neither a contract nor a commitment to lend)

**DATE:** April 24, 2007

**BORROWER:** JAMES A BRANDT

**LOAN NUMBER:** 20727772

**PROPERTY ADDRESS:** 25943 SANDALIA DRIVE
SANTA CLARITA, CA   91355

**ADJUSTABLE RATE LOAN PROGRAM: BEAR SELECT ARM**

This disclosure describes the features of the adjustable rate mortgage (ARM) program that you are considering. Information on other ARM programs is available upon request.

**How Your Interest Rate and Payment are Determined**

- Depending upon the ARM program for which you have applied, your interest rate will be fixed for either the first month or the first three months, after which your interest rate can change every month based upon the index rate plus a margin.
- Your payment can change once each year based on the interest rate, loan balance, and loan term.
- Your interest rate will be based on the "index rate" which is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year. The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. Ask us about our current interest rate and margin.
- Information about the index rate is published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").
- This adjustable rate loan may have a discount or premium feature, and your initial interest rate may not be based on the index used for later adjustments. Ask us for the amount of the current discount or premium.

**How Your Interest Rate Can Change**

- At each change date your new interest rate will equal the new  "index rate" plus the margin rounded to the nearest one eighth of one percentage point (0 .125%) unless your interest rate "cap" or your interest rate "floor" limit the amount of the change in interest rate.
- Your interest rate "cap" and "floor" work as follows:
    - Your interest rate cannot exceed 9.950%.
    - Your interest rate cannot decrease to less than the margin on your loan.

BSR 1041
Bear Select Arm Disclosure

EMC-JM 00668

**Your Monthly Payment And How It Can Change**

- Unless limited as set forth below, each month you will have the option of paying one of the following monthly payments:
  - o   A minimum payment calculated using the initial interest rate
  - o   An interest only payment
  - o   A fully amortizing payment based on a 15-year term to maturity
  - o   A fully amortizing payment based on the actual remaining term to maturity.

- Your monthly payment can increase or decrease substantially based on periodic changes in the interest rate.

- Your monthly payment can change once each year based on the Index rate and the margin.
- At each annual payment change date, your new minimum payment amount will be capped at an amount 7.5% more than your prior minimum payment amount.
- If your monthly payment is not sufficient to pay all interest due, any accrued and unpaid interest will be added to the loan principal and will accrue interest at the note rate. **This means the balance due on your loan could increase. This feature is called Negative Amortization**.
- Your loan principal can never be more than 115% of your original loan amount (110% if the property is located in New York). If your loan ever reaches that point, your monthly payment will be adjusted to a fully amortizing payment until the next scheduled adjustment date.
- Beginning on the fifth annual payment change date and on each fifth annual anniversary thereafter, your monthly payment will be changed to a fully amortizing payment based on the actual remaining term to maturity. You will continue to make this fully amortizing payment until the next scheduled payment adjustment date.
- You will be notified in writing at least 25 days before a payment adjustment is effective. The notice will contain information about your interest rate, payment amount and loan balance.


**Example for a loan in which the initial interest rate is fixed for one month:**

- On a new $10,000, 30-year loan with an initial interest rate of 1.25% based upon an index in effect as of the first working day of June, 2005, with a discounted rate, the maximum that the interest can rise under this program is 8.95 percentage points (8.95 %) to 9.95% in the 6th year and the payment could increase from a beginning payment of $33.33 to a maximum payment of $101.70 in the 3rd year. To see what your principal and interest payments would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. For example, the monthly payment on a mortgage amount of $60,000 would be: $60,000÷$10,000 = 6.0 x $33.33 = $199.98 per month.

**Example for a loan in which the initial interest rate is fixed for three months:**

- On a new $10,000, 30-year loan with an initial interest rate of 1.75% based upon an index in effect as of the first working day of June, 2005, with a discounted rate, the maximum that the interest can rise under this program is 8.95 percentage points (8.95%) to 9.95% in the 6th year and the payment could increase from a beginning payment of $35.72 to a maximum payment of $102.14 in the 3rd year. To see what your principal and interest payments would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. For example, the monthly payment on a mortgage amount of $60,000 would be: $60,000÷$10,000 = 6.0 x $35.72 = $214.32 per month.


I/We hereby acknowledge receipt of this Adjustable Rate Loan Program Disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.

BSR 1041
Bear Select Arm Disclosure

EMC-JM 00669

Borrower   JAMES A BRANDT                            / Date   4/24/07

_____            _____/_____
Borrower                                          / Date

_____            _____/_____
Borrower                                          / Date

_____            _____/_____
Borrower                                          / Date

BSR 1041
Bear Select Arm Disclosure

EMC-JM 00670

Loan No. 20727772

## PREPAYMENT NOTE ADDENDUM
### (Multi-State)

This Prepayment Note Addendum is made this 24th day of April, 2007 and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to **Bear Stearns Residential Mortgage Corporation** (the "Lender") which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at

25943 SANDALIA DRIVE
SANTA CLARITA, CA  91355
(the "Property")

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note, any addenda to the Note or the Security Instrument, Borrower and Lender covenant, and agree, that the provisions of the section of the Note entitled **"BORROWER'S RIGHT TO PREPAY"** or **"BORROWER'S PAYMENTS BEFORE THEY ARE DUE"** are amended to read as follows:

Subject to the prepayment penalty provided below, I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". A "full prepayment" is the prepayment of the entire unpaid principal due under this Note. A payment of only part of the unpaid principal is known as a "partial prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

**If within the 36 - month period beginning with the date I execute this Note (the "Penalty Period"), I make a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, I will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the lesser of (a) the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of this Note, calculated at the rate of interest in effect under the terms of this Note at the time of the prepayment; or (b) the maximum allowable prepayment penalty permitted by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

The Note Holder will apply all prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment amount, before applying my prepayment to reduce the principal amount of this Note. If I make a partial prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If this Note is an Adjustable Rate Note, partial prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase. If this Note is not an Adjustable Rate Note, partial prepayments will not change the amount of my monthly payments unless the Note Holder agrees in writing to these changes.

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE
ORIGINAL

BSR 1023 Prepay Addendum-Hard

EMC-JM 00775

The Note Holder's failure to collect a prepayment charge at the time a prepayment is received shall not be deemed a waiver of such charge. Any prepayment charge not collected at the time the payment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

**NOTE TO BORROWER**

**Do not sign this Addendum before you read it. This Addendum provides for the payment of a prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

BY SIGNING BELOW, the borrower(s) agree and consent to be bound by the terms of the Addendum.

_____ (Seal)    _____ (Seal)
JAMES A BRANDT                Borrower                                   Borrower

_____ (Seal)    _____ (Seal)
                              Borrower                                   Borrower

_____ (Seal)    _____ (Seal)
                              Borrower                                   Borrower

_____ (Seal)    _____ (Seal)
                              Borrower                                   Borrower

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

BSR 1023 Prepay Addendum-Hard

EMC-JM 00776

# EXHIBIT NO. 3

EXHIBIT 3

Case 2:09-cv-05438-SJO-JC    Document 158    Filed 02/03/11    Page 82 of 89    Page ID
#:4190
Case 3:09-cv-00107-HEH    Document 128    Filed 06/06/2009    Page 2 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE Eastern DISTRICT OF Virginia
RICHMOND DIVISION

FRANCES V. BYRON )
Plaintiff, )
v. )
EMC MORTGAGE CORPORATION, and BEAR )
STEARNS RESIDENTIAL MORTGAGE )
CORPORATION )    Case No. 3:09CV197
Defendants. )
)
)
)

DECLARATION OF CARL DELVECCHIO

I, Carl DelVecchio, am over eighteen years of age and hereby affirm the following based on my personal
knowledge:

1.      I am an Assistant Vice President and Legal Specialist Officer for J.P. Morgan Chase, the parent
company of EMC Mortgage Corporation ("EMC") and the successor in interest to Bear Stearns Residential
Mortgage Company ("Bear Stearns"). I have been employed by J.P. Morgan Chase since 1987.

2.      I am the head of the department of J.P. Morgan Chase that is responsible for all legal papers
served upon the company. In general, my department receives approximately 3,000 complaints, subpoenas and
other legal processes per day.

3.      Generally, when legal papers are served upon my department, staff employees review the
document and determine which of J.P. Morgan Chase's entities are implicated, and then forward the documents to
the appropriate department for further review and timely action.

4.      I am aware that a Complaint in the above-captioned case had been sent to my department by a
registered agent for both EMC and Bear Stearns on or about April 10, 2009.

5.      Upon review of the document, my department mistakenly read the Complaint as an attempt to
block foreclosure, as opposed to an action for monetary damages. As a result, the Complaint was forwarded to a
department at EMC that handles foreclosures. It should have been sent to our Legal Department which handles
actions for damages. In those cases, the Complaint is then referred to local outside counsel to respond in a timely
manner.

1

Case 2:09-cv-05438-SJO-JC  Document 158  Filed 02/03/11  Page 83 of 89  Page ID
Case 3:09-cv-00197-HEH  Document 12-3  Filed 06/03/2009  Page 3 of 3
#:4110

6.    Upon information and belief, individuals within the foreclosure department at EMC took no action on the Complaint because Plaintiff was seeking damages, and not an action to prevent foreclosure. Unfortunately, those individuals did not forward the Complaint back to the Legal Department at J.P. Morgan Chase.

7.    On or about June 1, 2009, our Legal Department learned that the Complaint had been filed, and that a Motion for Default was pending. We immediately retained outside counsel to respond and file the accompanying Motion to Set Aside Default.

8.    The failure to respond to the Complaint in a timely manner was due solely to a mistake in our company's intake process and a failure to send the Complaint to the proper department for review and response. The failure to respond was not the result of any purposeful or intentional acts on behalf of either Defendant, and upon learning of the mistake, we took immediate action to rectify the situation.

I solemnly affirm under the penalties of perjury pursuant to 28 U.S.C. § 1746, and based on personal knowledge, that the contents of the foregoing Affidavit are true.

June 3, 2009
Date

Carl Del Vecchio
Carl DelVecchio

TCO 357,937,279v1 6-2-09

# EXHIBIT NO. 4

**EXHIBIT 4**

Case 2:09-cv-05438-SJO-JC    Document 158    Filed 02/03/11    Page 85 of 89    Page ID
#:4112
Case 2:07-cv-05607-SJO-CT    Document 71    Filed 02/05/2009    Page 1 of 4

1 | Brian S. Kabateck (SBN 152054)
bsk@kbklawyers.com
2 | **KABATECK BROWN KELLNER LLP**
644 South Figueroa Street
3 | Los Angeles, California 90017
Phone: (213) 217-5000
4 | Fax:     (213) 217-5010

5 | David M. Arbogast (SBN 167571)
darbogast@law111.com
6 | Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
7 | **ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
8 | Tarzana, California 91356
Phone: (818) 961-2000
9 | Fax:     (818) 867-4820

10 | [*Additional counsel listed on signature page*]
Attorneys for Plaintiff and all others Similarly Situated
11 |

12 | **UNITED STATES DISTRICT COURT**

13 | **CENTRAL DISTRICT OF CALIFORNIA**

14 | JOSEPH A. MONACO, ANITA M.    )    **CASE NO. CV 07-05607 SJO (CTx)**
15 | MONACO, and JAMES BRANDT on )    [*Assigned to the Hon. James S. Otero*]
behalf of themselves and all others )
16 | similarly situated,              )    <u>CLASS ACTION</u>
17 |        Plaintiffs,        )
18 | v.                          )    **STIPULATED REQUEST FOR**
**DISMISSAL WITHOUT PREJUDICE;**
19 |                          )    **AND ORDER**
20 | BEAR STEARNS RESIDENTIAL   )
MORTGAGE CORPORATION; BEAR )
21 | STEARNS & CO.; and DOES 1 through )    Judge:        Hon. James S. Otero
200, inclusive,           )
22 |        Defendants.      )
23 |                          )    Complaint Filed: August 28, 2007
24 |                          )    Trial Date: Not set yet.
25 |
26 |
27 |
28 |

Stipulated Request for Dismissal without Prejudice - CV07-5607 SJO (CTx)

1    WHEREAS, Plaintiffs, JOSEPH A. MONACO, ANITA M. MONACO, JAMES

2  BRANDT and Defendants, BEAR STEARNS RESIDENTIAL MORTGAGE

3  CORPORATION and BEAR STEARNS & CO. (collectively "the Parties") have agreed,

4  pursuant to Federal Rule of Civil Procedure Section 41(a), to the dismiss this action,

5  without prejudice;

6    WHEREAS, Defendants, BEAR STEARNS RESIDENTIAL MORTGAGE

7  CORPORATION and BEAR STEARNS & CO., have agreed, for purposes of application

8  of the statute of limitations, to toll all claims brought, or that may have been brought, by

9  Plaintiffs in the Second Amended Complaint, for the period beginning on August 28,

10  2007 and extending through July 29, 2009;

11    WHEREAS, plaintiffs acknowledge that notwithstanding the tolling provided for

12  in the preceding paragraph, Defendants are reserving, and do not waive, any defenses,

13  including, but not limited to, defenses based on the statute of limitations, that existed as

14  of the commencement of this action on August 28, 2007, or that arise after July 29, 2009.

15    WHEREAS, the parties have agreed to bear their own attorney's fees and costs;

16

17    IT IS HEREBY STIPULATED by and among the parties hereto, through their

18  respective counsel of record, that an Order be entered providing as follows:

19    1.    The Second Amended Complaint in Monocco et al. v Bear Stearns

20        Residential Mortgage Corp. Case No. **CV07-5607 SJO (CTx)**, be dismissed

21        without prejudice.

22    2.    Any claims asserted by plaintiffs, or that could have been asserted by

23        plaintiffs, are tolled for purposes of the statute of limitations from

24        August 28, 2007  through July 29, 2009.

25    3.    Defendants have not waived any defenses that exists as of the date this

26        stipulation was entered.

27    4.    The Parties shall bear their own attorney's fees and costs.

28

1 | DATED: December 29, 2009                    ARBOGAST & BERNS LLP

2

3 | By: ___/s/ Jeffrey K. Berns_____
David M. Arbogast, Esq.
Jeffrey K. Berns, Esq.

4 | 19510 Ventura Boulevard, Suite 200
Tarzana, California 91356.

5 | Phone: (818) 961-2000
Fax:   (818) 867-4820

6

7 | Brian S. Kabateck, Esq.
KABATECK BROWN KELLNER LLP

8 | 644 South Figueroa Street
Los Angeles, California 90017
Tel: (213) 217-5000

9 | Fax: (213) 217-5010

10 | Paul R. Kiesel, Esq.
Patrick Deblase, Esq.

11 | Michael C. Eyerly, Esq.
KIESEL BOUCHER LARSON LLP

12 | 8648 Wilshire Boulevard
Beverly Hills, California 90210

13 | Phone: (310) 854-4444
Fax:   (310) 854-0812

14 | Attorneys for Plaintiff and all others
Similarly Situated.

15

16

17 | Dated:  January 29, 2009                    BURKE, WARREN, MACKAY &
SERRITELLA, P.C.

18

19 | By: /s/ Robert J. Emanuel
Robert J. Emanuel

20 | 330 N. Wabash Ave.
Chicago, Illinois 60611-3607
Admitted Pro Hac Vice

21

22 | Attorney for Defendants
BEAR STERNS RESIDENTIAL MORTGAGE

23 | CORPORATION and BEAR STEARNS & CO

24

25

26

27

28

-3-

Stipulated Request for Dismissal without Prejudice - CV07-5607 SJO (CTx)

**PROPOSED ORDER**

Having considered Plaintiff's unopposed Motion to Dismiss Action Without Prejudice, and GOOD CAUSE SHOWING, the Court GRANTS the request and ORDERS that this action is DISMISSED WITHOUT PREJUDICE pursuant to Federal Rule of Civil Procedure Section 41(a). Each party shall bear its own costs and attorney fees.

**IT IS SO ORDERED**.

Dated: February 5, 2009

_S. Jame Otero_
_____
HON.  JAMES OTERO
JUDGE OF THE DISTRICT COURT

Stipulated Request for Dismissal without Prejudice - CV07-5607 SJO (CTx)

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the State of California, County of Los Angeles. I am over the age of 18 and not a party to the within suit; my business address is 11377 W. Olympic Blvd., 5th Floor, Los Angeles, California 90064.

On **February 3, 2011**, I served the document described as: **SECOND AMENDED CLASS ACTION COMPLAINT** on the interested parties in this action by sending [  ] the original [or] [✓] a true copy thereof [✓] to interested parties as follows [or] [  ] as stated on the attached service list:

| | |
|---|---|
| Andrew D LeMar | Robert S. Beall |
| alemar@burkelaw.com | rbeall@sheppardmullin.com |
| LeAnn Pedersen Pope | Sacha V M Henry |
| lpope@burkelaw.com | shenry@sheppardmullin.com |
| Stephen R. Meinertzhagen | Shannon Z Petersen |
| smeinertzhagen@burkelaw.com | spetersen@sheppardmullin.com |
| Victoria R. Collado | **Sheppard Mullin Richter & Hampton** |
| vcollado@burkelaw.com | **LLP** |
| **Burke Warren MacKay & Serritella PC** | |

*Attorneys for Defendants*                    *Attorneys for Defendants*

[  ]    **BY MAIL (ENCLOSED IN A SEALED ENVELOPE):** I deposited the envelope(s) for mailing in the ordinary course of business at Los Angeles, California. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice, sealed envelopes are deposited with the U.S. Postal Service that same day in the ordinary course of business with postage thereon fully prepaid at Los Angeles, California.

[✓]    **BY E-MAIL:** I hereby certify that this document was served from Los Angeles, California, by e-mail delivery on the parties listed herein at their most recent known e-mail address or e-mail of record in this action.

[  ]    **BY FAX:** I hereby certify that this document was served from Los Angeles, California, by facsimile delivery on the parties listed herein at their most recent fax number of record in this action.

[  ]    **BY OVERNIGHT DELIVERY:** I am "readily familiar" with this firm's practice of collection and processing correspondence for overnight delivery. Under that practice, overnight packages are enclosed in a sealed envelope with a packing slip attached thereto fully prepaid. The packages are picked up by the carrier at our offices or delivered by our office to a designated collection site.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this **February 3, 2011** at Los Angeles, California.

| | |
|---|---|
| Diana Lee | *Diana Lee* (signature) |
| Type or Print Name | Signature |